49 P.3d 1227

STATE of Hawai'i, Plaintiff–Appellant,

v.

Murphy TAU'A, Defendant–Appellee.

No. 23992.

Supreme Court of Hawai'i.

June 28, 2002.

Jerrie L. Sheppard, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellant State of Hawai'i.

Mark Graven, on the briefs, for the defendant-appellee Murphy Tau'a.

MOON, C.J., LEVINSON, AND NAKAYAMA, JJ.; RAMIL and ACOBA, JJ., not joining.[1]

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant State of Hawai'i (the prosecution) appeals from an order of the second circuit court, the Honorable Shackley F. Raffetto presiding, granting the defendant-appellee Murphy Tau'a's motion to suppress (1) evidence that Maui Police Department (MPD) officers seized in executing a search warrant upon a vehicle in which Tau'a had been a passenger and (2) a written statement that Tau'a subsequently gave to the police.[2] On appeal, the prosecution principally contends that the circuit court clearly erred in connection with three of its findings of fact (FOFs) and, consequently, wrongly concluded, in its two conclusions of law (COLs), that a canine screening of the interior of the vehicle infringed upon Tau'a's federal and state constitutional rights to be free from unreasonable searches,[3] and, thus, re-

---

1. A separate opinion or opinions will be filed subsequently.

2. Pursuant to Hawai'i Revised Statutes (HRS) § 641–13(7) (1993), "[a]n appeal may be taken by and on behalf of the State from the district or circuit courts to the supreme court, subject to [HRS ch.] 602, in all criminal cases ... [f]rom a pretrial order granting a motion for the suppression of evidence, including a confession or admission[.]"

3. Article I, section 7 of the Hawai'i Constitution (1978) provides in relevant part that "the right of the people to be secure in their persons ... and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue except on probable cause[.]" Similarly, the fourth amendment to the United States Constitution provides in relevant part that "[t]he right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be

quired that the evidence obtained as a result of and tainted by the canine screen be suppressed at trial.

We hold on the record in this case that, because Tau'a's personal constitutional rights were not violated by the canine screen, Tau'a could not invoke either article I, section 7 of the Hawai'i Constitution or the fourth amendment to the United States Constitution, *see supra* note 3, as a basis for suppressing the evidence recovered from the vehicle. Because the officers' subsequent search of the vehicle—executed pursuant to a warrant obtained, in part, upon the canine's "alert" to the presence of narcotics in the vehicle—was not unconstitutional with respect to Tau'a, the circuit court further erred in concluding that Tau'a's subsequent written statement was "tainted" and inadmissible. Accordingly, we remand this matter for further proceedings.

## I. BACKGROUND

### A. Factual Background

On December 28, 1999, MPD officers executed warrants to arrest and search the person of Aaron Yamashita.[4] Acting on information that Yamashita would be in a particular area—specifically, an Eagle Hardware parking lot located in the Maui Market Place—in the late afternoon of December 28, 1999, approximately a dozen officers, in five different vehicles, participated in apprehending Yamashita. The officers awaited Yamashita's arrival in the area; when he arrived, driving a two-door "red king cab F-150 Ford pickup truck," the officers followed him and, shortly thereafter, succeeded in stopping the truck that he was driving.

In the truck with Yamashita, at the time the officers stopped it, were, in the front passenger seat, Jennifer Biho and, in the back seat, Tau'a. Although the officers ordered all three occupants out of the truck, it appears that they did not immediately heed the officers, because the record reflects that the officers themselves "opened" the truck's doors and that Yamashita was "taken out of the [truck] and proned out," Biho was "taken out of the [truck]," and Tau'a was "removed" from the truck, which, apparently, necessitated that two officers briefly enter it in order to reach him in the back seat.[5] Yamashita, Biho, and Tau'a were kept separated. The officers did not have warrants to search or arrest either Biho or Tau'a; nor did the officers have a warrant to search anything other than Yamashita's person.

The warrant authorizing a search of Yamashita's person was not, however, immediately executed. Rather, the officers asked Yamashita for his consent to search the truck. He refused, responding that the truck was not his.[6] Thereafter, within approximately ten or fifteen minutes of the officers stopping the truck, MPD Officer William Gannon, together with his "drug detection dog" Ben,[7] conducted a "canine screening" of the truck.[8] Officer Gannon described the canine screening that he conducted with Ben of the truck as follows:

> Utilizing a leash, we start[ed] at the front of the vehicle, work[ing our] way along the driver's side. At this point in time the door had been open[ed] [p]rior to my arrival[.] . . . The door was wide open.
>
> Me having a four-foot lead, a leash, Ben detected the odor emanating from within

violated, and no Warrants shall issue, but upon probable cause[.]"

4. Neither of these warrants were made a part of the record on appeal.

5. The record does not reflect the particular circumstances that prompted the officers to remove the occupants from the truck.

6. It appears that the officers, at some point that is not clear from the record, learned that the registered owners of the truck were Jay and Daralynne Pagay; MPD Officer Michael Callinan, who was present during the search, testified that he believed that officers may have unsuc-

cessfully attempted to contact the Pagays in order to obtain their consent to search the truck.

7. Ben is "[a] Belgian Malinois, he is a 60-pound canine. He is a male, very, very highstrung, agile, [and] can jump six feet no problem. These dogs are quick and agile. That's why," according to Officer Gannon, "law enforcement uses them."

8. At the time that Officer Gannon and Ben conducted the canine screening, Yamashita was "handcuffed on the ground."

the vehicle and immediately entered the vehicle, jumped over the driver's side seat through this opening between the front seats. There is a console that can fold down[, which] was open.

Ben made entry through that opening and immediately alerted to the base of the [front] passenger side seat.

Throughout his testimony, adduced during the hearing conducted in connection with Tau'a's motion to suppress, Officer Gannon consistently asserted that Ben had first detected the odor of narcotics while outside the vehicle, but did not "alert" to the actual location of those narcotics under the front passenger side seat until inside the truck.[9] According to Officer Gannon, Ben is trained to "go to the strongest source [of an odor he has detected] as fast as he can," or, in other words, to "follow his nose." Officer Gannon asserted that detecting or "indicating" an odor is distinct from an "alert," but did not elaborate with any degree of specificity as to what the distinction was. However, Officer Gannon did explain that, "[o]nce [Ben] indicates [an] odor, he's going to take his nose,

which is trained to detect the odor at the strongest source."

Because of Ben's size, temperament, quickness, agility, and training, Officer Gannon asserted that he could not have prevented Ben from jumping into the truck once Ben had detected the odor of narcotics emanating from it. After Ben "alerted" to the presence of narcotics in the truck, Officer Gannon told him, "Good boy," pulled him out of the truck, and ceased conducting the canine screening. Throughout Ben's sojourn in the truck, Officer Gannon asserted that he did not enter it himself, but conceded that his "hand maybe" broke "the pla[ne] of the door" as he was pulling Ben out of the truck. After Ben "alerted" to the presence of narcotics in the truck, Officer Callinan executed the warrant to search Yamishita's person; however, Officer Callinan did not find anything incriminating on Yamashita's person.

The truck was towed to a police station pending the issuance of a warrant to search it. Subsequently, upon Officer Gannon's affidavit,[10] a warrant was issued to search the

---

9. Specifically, Officer Gannon testified as follows:

> I started walking the dog around the open door, and then he detected the odor and jumped in and went behind the seat.
>
> . . . .
>
> He is on my left-hand side in a heel, following me. He detected the odor. At that point in time we were clearing the open end of the door and—
>
> . . . .
>
> . . . [W]e are walking around this door. He detects the odor and immediately goes in through—hops on the seat through that opening and alerts.

10. In addition to relating the officer's experience and training, as well as Ben's training and abilities, Officer Gannon's affidavit contained information that Officer Callinan had conveyed to him regarding the latter's investigation of Yamashita. Specifically, Officer Callinan had informed Officer Gannon that a confidential informant, whom the MPD narcotics vice section had known for two years and who had provided them with reliable information in the past, had informed Officer Callinan that, during the week of December 26, 1999, Yamashita possessed "about one [ ] pound of crystal methamphetamine and that Yamashita had instructed the informant to meet him at "the Eagle Hardware, within the Maui Market Place[,] on December 28, 1999 at around 4:30 p.m.," the area, that is, where the officers encountered and arrested Ya-

mashita as described above. (Some capitalization amended.) On the basis of this information, Officer Gannon's affidavit related, Officer Callinan "obtained a search warrant" to search Yamashita's person; the affidavit also notes that there was an outstanding bench warrant for Yamashita's arrest. Officer Gannon's affidavit further related the circumstances of Yamashita's arrest and the seizure of the truck he was found to be driving, including the fact that the truck was registered to Jay and Daralynne Pagay and that Officer Callinan, because of his ongoing investigation of Yamashita, "suspected that [c]rystal [m]themaphetamine [was] currently in the pickup truck." Officer Gannon noted that Yamashita had refused to consent to the search of the truck and, with respect to the canine screening of the truck, related

> [t]hat, at approximately 5:03 P.M., Affiant utilized the [MPD's] Narcotic Detection Canine "BEN" in screening the ... truck[.] ... Affiant observed the Narcotics Detection Canine "BEN" alert between the back seat and the center console within the vehicle, indicating the presence of an odor of an unknown illegal controlled substance within[.] ... [T]he driver[']s side door was halfway opened prior to my arrival[,] and ... Canine "BEN" entered the vehicle of his own free will.

Officer Gannon's affidavit averred that, through his experience and training, he "kn[e]w ... that those involved in the use and distribution of

truck, and, in executing the warrant, officers found: (1) various items of alleged drug paraphernalia, some of which contained "residue," in the "third door/panel"; (2) a nine millimeter semi-automatic pistol under "the back seat" (apparently on the driver's side); and (3) a "cut plastic straw (loader)," apparently under the front seat.[11] These items predicated the three-count indictment against Tau'a in the present matter, which charged him with committing, as either a principal or an accomplice, the offenses of promoting a dangerous drug in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1243(1) (1993), prohibited acts related to drug paraphernalia, in violation of HRS § 329–43.5(a) (1993), and unlawful place to keep a firearm, in violation of HRS § 134–6(d) (Supp.2000).

The record on appeal contains scant factual information as to what transpired after Ben alerted to the presence of narcotics in the truck. However, it appears that, at some point after the truck was searched and the foregoing items found, Tau'a was arrested, initialed and signed a MPD Form No. 103, which informed him of his "constitutional rights" and pursuant to which he waived those rights, and gave a written statement to police.[12]

### B. *Procedural Background*

Before his trial was due to commence, Tau'a filed a motion in which he sought to suppress and preclude the prosecution from using at trial (1) "all evidence [that] was seized ... on December 28, 1999[,] as such search and seizure violated [his] rights under Article I, Section 7 of the Hawai'i State Constitution and the Fourth and Fourteenth Amendments of the United States Constitution,"[13] and (2) "all statements made ... by [him] as tainted fruits of the initial unlawful search and seizure." Conceding that, generally speaking, a person does not have a reasonable expectation of privacy in the air surrounding his or her effects and, therefore, that "a narcotics detection dog may sniff the air outside a car or a suitcase without a search warrant," the crux of Tau'a's argument was that "the police may not[, however,] send the dog into a car or closed container to physically venture into places where the police may not go." Tau'a cited several federal cases and this court's decision in *State v. Groves,* 65 Haw. 104, 649 P.2d 366 (1982), as support for his position.

Because, in Tau'a's view, Ben's alert to the presence of narcotics was unlawful, it could not be used as a predicate for establishing probable cause to issue a warrant to search the truck; thus, Tau'a contended that Officer Gannon's affidavit, *see supra* note 10, redacted of its references to Ben's alert, was "insufficient to establish probable cause" to search the truck. Finally, Tau'a urged that, insofar as both Ben's "dog sniff" and the search warrant "violated the Fourth Amendment and article I, section 7," his subsequent written statement, which was "obtained as a result of [those] violations," was "tainted and must be suppressed as 'fruits of the poisonous tree,'" citing, in this regard, *State v. Bonnell,* 75 Haw. 124, 856 P.2d 1265 (1993).

In opposition, the prosecution's principal argument was that Tau'a "had no [reasonable] expectation of privacy [in the truck] because he was a mere passenger in a vehicle [that] was parked in a public parking lot." Thus, the prosecution, citing both state (in-

---

illegal [n]arcotics often transport and store illegal [n]arcotics within their vehicles or carry it on their person." The affidavit concludes with a specification of the contraband that he suspected might be within the truck.

11. MPD officers also recovered nearly eight thousand dollars in "U.S. currency," a "floral purse" containing papers bearing Biho's name and various cosmetics, Yamashita's "phone address book," two cell phones, and a "Radio Shack scanner."

12. Tau'a's statement has not been made a part of the record on appeal, nor was it admitted into evidence at the suppression hearing. However, a copy of his written statement is appended to the prosecution's opening brief. In his statement, Tau'a asserts that the firearm recovered from the truck was not his and that he thought it belonged to Yamashita. Tau'a further asserted that he believed Yamashita owned several other firearms, sketching, as one of them, what appears to be a submachine gun with a scope.

13. Tau'a incorporated by reference (and appended as an exhibit) the MPD's list of the items recovered from the truck.

cluding *Bonnell*) and federal cases, urged that the canine screening that Officer Gannon and Ben conducted, despite any alleged illegality as to Ben's entry into the truck, did not infringe upon Tau'a's personal constitutional rights under either the fourth amendment or article I, section 7. In the alternative, the prosecution contended that, "even if [Tau'a] had a reasonable expectation of privacy in the pickup cab area where the canine alerted, the canine's entry [into] the vehicle was not an unreasonable search in violation of the Fourth Amendment or the Hawai'i constitution." In support of its position that the canine screening in the present matter did not constitute an unreasonable search, the prosecution principally relied upon *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), and *Groves, supra.* Finally, the prosecution urged that, absent any constitutional violation as to Tau'a, his subsequent statements were not tainted.

The circuit court conducted a hearing in connection with Tau'a's motion. At the hearing, the prosecution initially attempted to argue that Tau'a lacked "standing" to bring the motion, instigating a short exchange between the court and the parties:

> THE COURT: Call your first witness.
>
> [Deputy Prosecuting Attorney (DPA)]: Your Honor, we think that the defendant should be establishing [his] standing before we have to present evidence.
>
> THE COURT: Why?
>
> [DPA]: Because this wasn't his vehicle and he was outside the vehicle and the vehicle was parked in a public parking lot with the doors open.
>
> He was also not the target of the stop.
>
> THE COURT: He's charged with possession of the drugs that were found in the truck; right?
>
> [Defense Counsel]: Yes, after he was taken out as a passenger of that vehicle.
>
> [DPA]: Yes. He is also charged with the gun.

THE COURT: I think [that] the burden on the State is to show that the search was okay with respect to this person.

[DPA]: Okay.

Thereafter, the prosecution called Officers Callinan and Gannon as witnesses; they testified as to the facts set forth *supra* in section I.A. The prosecution introduced, without objection, five exhibits, specifically, Officer Gannon's affidavit in support of the warrant, a "return and affidavit" that documented the execution of the warrant, a two-page handwritten list of the items found in the truck and seized as evidence, and the MPD "waiver" Form 103 bearing Tau'a's signature. In the course of examining Officer Gannon, the prosecution began to ask questions pertaining to Tau'a's statement. The circuit court interrupted the questioning with the query, "What's that got to do with the search?" After the circuit court remarked that "[a]ll we are really talking about here is the dog going into the car," the prosecution ceased its direct examination of Officer Gannon.[14]

At the conclusion of the prosecution's presentation, the circuit court indicated, before it heard argument, that its "inclination" was to grant Tau'a's motion:

> Okay. Let me focus on this a little bit.
>
> It appears from the record before the court that the truck was stopped and opened legally pursuant to the warrant for arrest and search of the person who was driving the car, and those people were out. The scene was completely secured by the time that the dog screening was ordered, but the door was open to the vehicle.
>
> And it's apparent from the testimony that it was clear to the officer with the dog that the dog was not to be permitted to go into the vehicle; that that would have been an illegal search.[15]
>
> What's unclear is—I mean, there is evidence—the only evidence in the record is that the dog actually alerted after it got into the truck, not before, though it's—I guess it's arguable that he may have

---

14. The record reflects one other instance in which the circuit court remarked that "the issue here has to do with that open door."

15. Officer Gannon testified that he did not intend that Ben enter the vehicle because "[t]hat's an illegal search if I command my canine to enter a vehicle."

smelled something and that's why he went in.

But it's just a[s] fair [an] inference that he got in because the door was open and the dog's transported from place to place by car, and the police officer didn't control the dog jumping in. That one thing that could have been done to prevent this whole thing from happening is the door being closed. There is no evidence that that could not have happened.

My view is that it's incumbent upon the police to do the search in the correct manner, and that would be not going in the vehicle,[16] and so I think my inclination is to grant the motion for that reason[.]

The court then solicited argument from the parties.

Tau'a concurred with the circuit court's reasoning, remarking that Officer Gannon should have controlled Ben and that "the dog [shouldn't] control the search." The prosecution, on the other hand, contended that "it's not that [Officer Gannon lacked] control of the dog; it's just that the dog reacted so quickly there was no opportunity to control the dog." In response to the circuit court's remark that "there was no reason given as to if there was any necessity that the door be open" and that Officer Gannon could have closed the door before commencing the canine screening, the prosecution responded that "[h]e didn't have any knowledge that there was a need to close the door at this point."

The circuit court orally granted Tau'a's motion, ruling as follows:

Okay. Well, it's the court's view that [Officer Gannon] knew that the dog would not be permitted in the car, and when you walk by with a loose leash, there is a chance the dog could jump in, and that's exactly what happened.

And I think—you know, the purpose of the Fourth Amendment, in the court's view, is to make sure that—that searches under the Fourth Amendment are—that the State, when it does these searches, complies with all the rules that apply to them.

And I think that it's incumbent upon the State to make sure that these kind of accidents don't happen, because when we review them in the court, all we have is the testimony of the people. We don't have— we weren't at the scene, and so it's hard to say there is no evidence of any exigencies that require that door to be open. It could easily have been closed. The purpose was for screening outside the vehicle, not the inside.

And so for those reasons, I am going to go ahead and grant the motion.

Although the prosecution advanced further argument,[17] the circuit court did not alter its ruling and ordered that Tau'a prepare an appropriate order.[18]

---

**16.** The record contains no evidence with respect to any MPD canine screening protocols or any other information as to what the "correct manner" of conducting a canine screening actually is, either in fact or as a matter of constitutional jurisprudence.

**17.** Specifically, the prosecution noted that the United States Court of Appeals for the Tenth Circuit held, in *Stone*, that a canine's entry into a vehicle did not amount to an unreasonable search in the absence of any evidence that police officers physically placed the canine in the vehicle or commanded the canine to enter it and urged that "there is no real reason why ... law enforcement should have been shutting doors or changing the scene from what it was when [Officer Gannon] arrived at the scene." The circuit court reiterated that, in its view, "law enforcement controlled the scene and allowed the situation to occur, and ... that it's incumbent upon law enforcement to do it correctly." In re-

sponse, the prosecution posed a hypothetical: "[i]f a scene is like this scene but the door is closed and the window is open, do officers have an obligation to open the door, close the window, and shut the door, so the dog doesn't jump through the window?" The circuit court replied, "I think they should prevent the dog from jumping through the window, yeah."

**18.** The record reflects that the prosecution, although not ordered to do so, submitted a proposed order to the court. In relevant part, the prosecution proposed that the court conclude that, although the initial stop, order to exit the vehicle, physical removal of the occupants from the vehicle, and order to conduct a canine screen of the vehicle were all reasonable and that there was not an unreasonable delay in procuring a canine to conduct the screen, the officers' "failure to prevent [Ben's] entry into the vehicle by shutting the doors constituted an unreasonable search[.]"

The circuit court's written order granting Tau'a's motion to suppress contains eight FOFs and two COLs. The circuit court found:

1. On December 28, 1999, the truck in which Murphy Tau'a, Aaron Yamashita, and Jennifer Biho were travelling in was legally stopped by the Maui Police officers assigned in this case who had an arrest and search warrant for Mr. Yamashita.

2. All of the occupants of the vehicle were removed and out of the truck.

3. The scene was completely secured by the time the dog screen was ordered, but the door to the truck was open.

4. It was apparent from the testimony of officer Gannon that he was aware that the dog was not permitted to enter the vehicle as that would have amounted to an illegal search.

5. The only evidence on the record is that the dog alerted after he entered the truck.

6. A fair inference is that the dog got into the truck because it had been transported from place to place by car, and the police officer did not control the dog jumping in.

7. The police closing the door to the truck prior to the dog sniff would have prevented this whole thing from happening.

8. There was no reason given that there was any necessity that door of the vehicle be open.

And the circuit court concluded:

1. Based on the findings the court concludes that the search and seizure did not comply with the requirements of the rules required of this type of dog search and violated Mr. Tau'a's Hawai'i State and United States Constitutional protections.

2. All of the evidence recovered by this illegal search and seizure and any subsequent statements of Mr. Tau'a's [are] suppressed and the State is precluded from offering the same at trial.

The prosecution timely appealed from the foregoing order.

## II. STANDARDS OF REVIEW

### A. Constitutional Law

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points in original omitted).

### B. Motion To Suppress

■ "We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.'" *Id.* (citations and some quotation signals omitted). Similarly, "[w]hether an actual, subjective expectation of privacy is one that society would recognize as objectively reasonable is a question of law, and the issue is therefore reviewed *de novo* on appeal." *Bonnell*, 75 Haw. at 142, 856 P.2d at 1275 (citation omitted).

## III. DISCUSSION

On appeal, the prosecution contends that the circuit court's FOF Nos. 5, 6, and 7 are clearly erroneous and that its COL Nos. 1 and 2 are wrong. The prosecution advances several arguments in support of its view that the circuit court erred in granting Tau'a's motion to suppress, the bulk of which address the constitutional propriety of Ben jumping into the truck and whether this fact renders the canine screening an unreasonable search within the meaning of either the fourth amendment to the United States Constitution or article I, section 7 of the Hawai'i Constitution, *see supra* note 3. The prosecution also argues, however, that Tau'a "had no legitimate expectation of privacy in the area [that Ben] sniffed" and, as such, that his invocation of both the fourth amendment and article I, section 7 is misplaced.

In light of our discussion *infra*, we agree with the prosecution that, assuming *arguendo* that, because Ben leapt into the truck, the canine screening constituted a "search" within the meaning of either the fourth amendment or article I, section 7, Tau'a did not have a reasonable expectation of privacy in

the truck (or, more specifically, in the airspace within the cab of the truck). Thus, neither Ben's nor Officer Gannon's conduct violated Tau'a's state or federal constitutional rights.

At the outset, it is important to identify the constitutional questions that the present matter does *not* implicate. The items that Tau'a sought to suppress were not found in a closed container that Tau'a claimed was his; as such, our constitutional jurisprudence regarding searches of closed containers is not implicated. *See, e.g., State v. Wallace,* 80 Hawai'i 382, 394–96, 400–05, 910 P.2d 695, 707–09, 713–18 (1996). Nor is Hawai'i case law concerning the seizure of passengers, such as when a police officer orders a passenger to exit a vehicle, apposite to the facts herein. *See, e.g., State v. Bolosan,* 78 Hawai'i 98, 105, 890 P.2d 685, 692 (App.1994). Specifically, Tau'a has challenged the constitutionality of the canine screen and the sufficiency of the affidavit supporting the issuance of the search warrant assuming the redaction of the information obtained by the canine screen. As such, he has sought to suppress the items subsequently found in the vehicle, as well as his subsequent and purportedly "tainted" statement. Tau'a does not assert *any* interest in the vehicle at all, be it ownership (as by one to whom the owner has loaned it) or otherwise.

A. *The Circuit Court Erred In Concluding That The Canine Screening Violated Tau'a's Fourth Amendment Rights.*

▪ Upon the foregoing understanding of the record in the present matter, the circuit court was wrong to conclude that the canine screen infringed upon the rights secured to Tau'a by the fourth amendment to the United States Constitution. As a matter of federal constitutional law, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing, *inter alia, Simmons v. United States,* 390 U.S. 377, 389–90, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). On facts similar, in all

material respects, to those presented here, the United States Supreme Court has held that a "passenger *qua* passenger" does not have a legitimate expectation of privacy in the vehicle in which he or she is a passenger. *See id.* at 148–49, 99 S.Ct. 421.

▪ In *Rakas,* the defendants—all passengers in a vehicle driven, at the time that police officers stopped and searched it, by its owner—sought to suppress various items found within the vehicle. *Id.* at 130–31, 99 S.Ct. 421. The United States Supreme Court reaffirmed that the " 'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.' " *Id.* at 139, 99 S.Ct. 421 (quoting *Simmons,* 390 U.S. at 389, 88 S.Ct. 967) (brackets and ellipsis points in original). Although the "capacity to claim the protection of the Fourth Amendment" does not depend "upon a property right in the invaded place," a defendant "who claims the protection of the [Fourth] Amendment" must assert that he or she "has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 88 S.Ct. 967 (citing, *inter alia, Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). In other words,

> a defendant must demonstrate that he [or she] personally has an expectation of privacy in the place searched, and that his [or her] expectation is reasonable; *i.e.,* one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *Rakas,* 439 U.S. at 143–44 & n. 12, 99 S.Ct. 421); *see also United States v. Padilla,* 508 U.S. 77, 81–82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993); *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *United States v. Jacobsen,* 466 U.S. 109, 123 n. 22, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Thus, because the *Rakas* defendants asserted "neither a property interest nor a possessory interest in the automobile [searched],

nor an interest in the property seized," and because the fact that they were " 'legitimately on [the] premises' in the sense that they were in the car with the permission of its owner" was not determinative "of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched," their claims under the fourth amendment "fail[ed]." *Id.* at 148, 99 S.Ct. 421 (quoting *Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). In short, the *Rakas* defendants did not have "a legitimate expectation of privacy" in either the glove compartment or the area under a seat of the car in which the items that they sought to suppress were found. *Id.* at 148–49, 99 S.Ct. 421.

In all material respects, *Rakas* is indistinguishable from the present matter. Like the *Rakas* defendants, Tau'a was nothing more than a passenger in the vehicle that officers subjected to a canine screen and, subsequently, searched. At no point, even in response to the prosecution's initial argument that he lacked "standing" to invoke the protections of either the fourth amendment to the United States Constitution or article I, section 7 of the Hawai'i Constitution, did Tau'a assert any interest in any part of the vehicle. For that matter, the record is devoid of any indication that he was even in the vehicle with its owner's permission.

Thus, on the record before us, Tau'a did not carry his burden of establishing that the canine screening or the subsequent search of the vehicle in which he was a mere passenger infringed upon a legitimate expectation of privacy that he held in the areas searched. Indeed, he has never claimed that, during the relevant period, he even held such an actual, subjective expectation, much less one that society would regard as being objectively reasonable. As such, Tau'a did not establish that the protections afforded to him by the fourth amendment were violated. Accord-

ingly, assuming *arguendo* that the canine screening amounted to a "search" under federal constitutional law because Ben leapt into the vehicle, the circuit court erred in concluding that the items seized in executing the search warrant upon the vehicle, as well as Tau'a's subsequent statement, were inadmissible as a matter of federal constitutional law. *See Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (noting that in *Rakas*, 439 U.S. at 132–50, 99 S.Ct. 421, "we held that automobile passengers could not assert the protection of the Fourth Amendment against the seizure of incriminating evidence from a vehicle where they owned neither the vehicle nor the evidence").

B. *The Circuit Court Erred In Concluding That The Canine Screening Violated Tau'a's Article I, Section 7 Rights.*

Finally, the circuit court erred in concluding that the police violated Tau'a's rights under article I, section 7 of the Hawai'i Constitution. In *State v. Abordo*, 61 Haw. 117, 596 P.2d 773 (1979), this court adopted, as a matter of state constitutional law, the United States Supreme Court's holding in *Rakas* that the proponent of a motion to suppress must establish that his or her *own* constitutional rights, rather than the rights of a third party, were violated by the challenged search and/or seizure.[19] *See also State v. Edwards*, 96 Hawai'i 224, 232, 30 P.3d 238, 246 (2001) ("the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his or her own ... rights were violated"); *State v. Araki*, 82 Hawai'i 474, 483, 923 P.2d 891, 900 (1996) (quoting *Abordo* for the foregoing proposition). Thus, Tau'a bore the burden of establishing—by a preponderance of the evidence, *see Edwards*, 96 Hawai'i at 232, 30 P.3d at 246 (quoting *State v. Wilson*, 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999))—

19. In doing so, this court approved the United States Supreme Court's view, expressed in *Rakas*, that a defendant's ability to benefit from the exclusionary rule is a question of substantive law, rather than "standing." *See Abordo*, 61 Haw. at 121, 596 P.2d at 776. Quite simply, "[a] criminal defendant always has standing to challenge the admission of evidence introduced by the state." *State v. Tanner*, 304 Or. 312, 745 P.2d 757, 759 (1987). Whether a defendant may avail him or herself of the exclusionary rule, however, is a question of substantive search and seizure law, *i.e.*, whether his or her own reasonable expectations of privacy have been violated. *See Abordo* 61 Haw. at 121–22, 596 P.2d at 777.

that the police officers' conduct, including Ben's, infringed upon the protections afforded to him by article I, section 7.

 Article I, section 7 "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *Bonnell*, 75 Haw. at 136, 856 P.2d at 1272 (citations omitted). As we have remarked, "the primary purpose of both the [f]ourth [a]mendment and article I, section 7 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" *State v. Lopez*, 78 Hawai'i 433, 441, 896 P.2d 889, 897 (1995) (quoting *Bonnell*, 75 Haw. at 136, 856 P.2d at 1272). "In ascertaining whether an individual's expectation of privacy brings the governmental activity at issue into the scope of constitutional protection," this court utilizes the two-part test derived from *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring): "'First, [the person] must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable.'" *Lopez*, 78 Hawai'i at 441–42, 896 P.2d at 897–98 (quoting *Bonnell*, 75 Haw. at 139, 856 P.2d at 1274); *see also Abordo*, 61 Haw. at 122–23, 596 P.2d at 776–77.

Although we have consistently required defendants seeking to avail themselves of the exclusionary rule to satisfy the *Katz/Rakas* test—*i.e.*, to demonstrate that their own reasonable expectations of privacy have been violated—there is dictum in *Abordo* acknowledging the so-called "automatic standing" rule established by the United States Supreme Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *See Abordo*, 61 Haw. at 121 n. 3, 596 P.2d at 776 n. 3. Pursuant to the "automatic standing" rule, a defendant charged with a "possessory" offense need not establish that his or her own constitutional rights have been violated in order to avail him or herself of the exclusionary rule. *See Jones*, 362 U.S. at 263–65, 80 S.Ct. 725. Consequently, the defendant must merely establish that the search and/or seizure was illegal—*i.e.*, that someone's (indeed anyone's) constitutional rights were violated—and that the evidence

sought to be excluded was obtained as a result of the illegal search. For the reasons discussed *infra*, we decline to adopt the *Jones* "automatic standing" rule as a matter of state constitutional law.

One year after this court's decision in *Abordo*, the United States Supreme Court overruled *Jones* in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In *Salvucci*, seven justices agreed that the "automatic standing" rule enunciated in *Jones* had "outlived its usefulness" and "now serves only to afford a windfall to defendants whose [f]ourth [a]mendment rights have *not* been violated." *Salvucci*, 448 U.S. at 95, 100 S.Ct. 2547 (emphasis in original). First, the Court noted that the "cornerstone" of *Jones*—the concern that the defendant's testimony offered in support of his or her motion to suppress would subsequently be introduced by the prosecution at trial as evidence of guilt—had been eroded by *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), which held that "testimony given by a defendant in support of a motion to suppress cannot be admitted as evidence of his [or her] guilt at trial." *Salvucci*, 448 U.S. at 88, 100 S.Ct. 2547. Second, the Court concluded that, due to the evolution of fourth amendment doctrine (specifically, the development of the "legitimate expectation of privacy" analysis), it was no longer inherently contradictory for the prosecution simultaneously to maintain that "a defendant criminally possessed the seized good, but was not subject to a [f]ourth [a]mendment deprivation[.]" *Id.* at 90, 100 S.Ct. 2547. The Court reasoned that decisions such as *Katz* and *Rakas* "clarify that a prosecutor may, with legal consistency and legitimacy, assert that a defendant charged with possession of a seized item did not have a privacy interest violated in the course of the search and seizure." *Id.* at 88–89, 100 S.Ct. 2547. Finally, citing to the companion case of *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), issued by the Court on the same day as *Salvucci*, the Court reasoned that "legal possession of a seized good is not a proxy for determining whether the owner had a[f]ourth [a]mendment interest, for it does not invariably represent the protected [f]ourth [a]mendment

interest." [20] *Id.* at 91, 100 S.Ct. 2547. Consequently, the Court "simply decline[d] to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Id.* at 92, 100 S.Ct. 2547.

Following *Salvucci*, this court has generally avoided reliance on *Jones, but see State v. Araki,* 82 Hawai'i 474, 484, 923 P.2d 891, 901 (1996) (citing *Jones* for the proposition that it is not enough for a proponent of a motion to suppress to " 'claim[ ] prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else' "); *State v. Lo,* 66 Haw. 653, 661–62, 675 P.2d 754, 760 (1983) (citing *Jones* for the proposition that "[a] person permitted to use an apartment may 'invoke the privacy of the premises' to challenge the legality of a search thereof"); *State v. Kanda,* 63 Haw. 36, 49, 620 P.2d 1072, 1081 (1980) (citing *Jones* for the unremarkable proposition that "[t]he facts and circumstances presented in [an] affidavit [in support of the issuance of a search warrant] must be sufficient for a reasonably cautious person to conclude that the items sought in connection with the crime are probably located within the premises to be searched at the time the warrant is issued"), and, on one occasion, has specifically declined to address whether it would recognize the "automatic standing" rule as a matter of state constitutional law. *See State v. Joyner,* 66 Haw. 543, 546 n. 1, 669 P.2d 152, 154 n. 1 (1983).

The majority of our sister states have, as have we, adopted the "legitimate expectation of privacy test" without addressing the "automatic standing" rule as a matter of state constitutional law. *See generally* David A. Macdonald, Jr., *Standing to Challenge Searches and Seizures: A Small Group of States Chart Their Own Course,* 63 Temp. L.Rev. 559, 572 n. 119 (1990). Among the courts that *have* addressed whether to adopt or retain the "automatic standing" rule as a matter of state constitutional law, we are aware of six that have expressly rejected or

eliminated "automatic standing," *see Gahan v. State,* 290 Md. 310, 430 A.2d 49 (1981); *People v. Smith,* 420 Mich. 1, 360 N.W.2d 841 (1984); *State v. McCrary,* 621 S.W.2d 266 (Mo.1981); *People v. Ponder,* 54 N.Y.2d 160, 445 N.Y.S.2d 57, 429 N.E.2d 735 (1981); *State v. Lind,* 322 N.W.2d 826 (N.D.1982); *State v. Callaway,* 106 Wis.2d 503, 317 N.W.2d 428 (1982), and six that have adopted or retained the rule, *see Commonwealth v. Carter,* 424 Mass. 409, 676 N.E.2d 841 (1997); *State v. Bullock,* 272 Mont. 361, 901 P.2d 61 (1995); *State v. Settle,* 122 N.H. 214, 447 A.2d 1284 (1982); *State v. Alston,* 88 N.J. 211, 440 A.2d 1311 (1981); *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983); *State v. Jones,* 45 P.3d 1062 (Wash.2002). But most of the courts that have approved the "automatic standing" rule have also either expressly or impliedly abrogated the *Katz/Rakas* "legitimate expectation of privacy" test to which we subscribe. *See Settle,* 447 A.2d at 1287 (rejecting the "legitimate expectation of privacy" standard as a matter of state constitutional law as overly "fact-specific"); *Alston,* 440 A.2d at 1318–19 (rejecting the "legitimate expectation of privacy" standard as "vague" and "contrary to a fundamental principle rooted in Article I, paragraph 7 of the New Jersey Constitution"); *Sell,* 470 A.2d at 468 (rejecting the "legitimate expectation of privacy" standard, as a matter of state constitutional law, on the ground of being "amorphous"); *Jones,* 45 P.3d 1062 (presuming that the challenged search was impermissible without determining whether anyone's reasonable expectation of privacy had been violated); *see also State v. Wood,* 148 Vt. 479, 536 A.2d 902, 908 (1987) (rejecting the "legitimate expectation of privacy" test as a matter of state constitutional law, although not addressing the "automatic standing" rule).

In addition, although the Massachusetts Supreme Judicial Court purports to have retained the "automatic standing" rule, it nevertheless requires defendants with "automatic standing" to satisfy the *Katz/Rakas* test. In *Carter,* for example, the Massachusetts Supreme Judicial Court required a defendant

---

**20.** In *Rawlings,* the Court specifically held that ownership of an item seized, without more, does not permit a defendant to claim that the state intruded upon his or her own reasonable expectations of privacy. *Rawlings,* 448 U.S. at 105–06, 100 S.Ct. 2556.

cloaked with "automatic standing" to demonstrate that the evidence he sought to suppress was seized as a result of " 'police conduct [that] has intruded on [the defendant's own] constitutionally protected reasonable expectation of privacy.' " 676 N.E.2d at 843 (citations omitted). But "automatic standing" is virtually meaningless if the proponent of a motion to suppress must still satisfy the *Katz/Rakas* test, which the proponent would be required to do *without* "automatic standing." [21]

Montana alone has seemingly adopted the "automatic standing" rule while utilizing the "legitimate expectation of privacy" analysis in such a way as to permit a defendant to avail himself or herself of the exclusionary rule under circumstances in which the challenged search violated a *third party's* "legitimate expectation of privacy." *See Bullock,* 901 P.2d at 67, 69–70, 75–76. But, of course, such third party standing is contrary to the central holding of *Rakas* and the tenets of our own jurisprudence pertaining to article I, section 7.

We recognize that, "as the ultimate judicial tribunal with final unreviewable authority to interpret and enforce the Hawai'i Constitution," we may "give broader protection under the Hawai'i Constitution than that given by the federal constitution[,]" *State v. Rogan,* 91 Hawai'i 405, 423, 984 P.2d 1231, 1249 (1999) (citations and internal quotations signals omitted), "when logic and a sound regard for the purposes of those protections have so warranted." *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974). But we do not believe that logic and a sound regard for the purposes of article I, section 7 require us to dispense with the *Katz/Rakas*

test and adopt the "automatic standing" rule in cases involving defendants charged with "possessory" crimes.[22]

The exclusionary rule protects only those defendants whose *own* constitutional rights have been violated; there is no compelling reason to make an exception for defendants charged with possessory offenses. As the United States Supreme Court held in *Rawlings,* a mere possessory interest in a seized item does not necessarily mean that the possessor's reasonable expectation of privacy has been infringed. *Rawlings,* 448 U.S. at 105–06, 100 S.Ct. 2556. For example, a defendant who leaves evidence in a place readily accessible to the public may retain an ownership interest in his or her possessions, but he or she certainly does not retain any reasonable interest in the "privacy" of the evidence. Consequently, a possessory or ownership interest in a thing cannot serve as a substitute for a determination that a defendant's own reasonable and constitutionally protected expectation of privacy in the thing has been abused.

This does not mean that "effects" are not protected under the United States and Hawai'i Constitutions. To the contrary, effects, like homes and persons, *are* constitutionally protected. But in order to invoke the protections of the exclusionary rule, the proponent of a motion to suppress must show that constitutional rights personal to him or her have been implicated by the search and/or seizure.

We believe that allowing a defendant charged with a possessory offense to avail himself or herself of the exclusionary rule as a function of the violation of a third party's

---

21. In light of this redundancy, we noted in *Joyner* that the reasonable expectation of privacy test obviated the need to address whether defendants charged with possessory crimes are accorded "automatic standing" to raise claims of an unreasonable search and seizure. *Joyner,* 66 Haw. at 546 n. 1, 669 P.2d at 154 n. 1. Thus, arguably, this court has, albeit in dictum, *already* deemed the "automatic standing" rule to be meaningless in the wake of our adoption of the *Katz/Rakas* analysis for challenges under article I, section 7. Prior to *Rakas* and *Salvucci,* however, in addressing a fourth amendment challenge, this court did commingle the *Jones* "automatic standing" rule with the *Katz* "reasonable expec-

tation of privacy" test in a manner similar to that applied by the Massachusetts Supreme Judicial Court in *Carter. See State v. Dias,* 52 Haw. 100, 470 P.2d 510 (1970) (examining whether a defendant with "automatic standing" had a reasonable expectation of privacy in the area searched).

22. We note that the sole material textual difference between article I, section 7 of the Hawai'i Constitution and the fourth amendment to the United States Constitution is that the Hawai'i Constitution specifically protects persons against "invasions of privacy." *See supra* note 3.

constitutional rights would produce absurd results. An automobile thief, for example, would be in a position to assert the constitutional rights of the true owner of the automobile as a predicate for the suppression of evidence seized therein. *See, e.g., State v. Simpson,* 95 Wash.2d 170, 622 P.2d 1199 (1980) (plurality opinion) (holding that, pursuant to the "automatic standing" rule, the defendant had the same reasonable expectation of privacy in his stolen automobile as the true owner). Or a defendant who deposits illegal contraband on a neighbor's porch, while attempting to avoid apprehension, could assert the constitutional rights of the neighbor as the basis for suppressing the evidence subsequently discovered pursuant to a police search of the neighborhood. *See, e.g., Carter,* 676 N.E.2d at 843 (rejecting defendant's "automatic standing" argument and noting that "it would be more than inappropriate to permit a person fleeing from the police to rely on art. 14 [of the Massachusetts Constitution] to suppress evidence that he left on some third person's property"). Requiring that the proponent of a motion to suppress establish that his or her own constitutional rights have been violated, rather than those of a (possibly hypothetical) third party, avoids such anomalous results.

Most importantly, the original justifications for the "automatic standing" rule—prosecutorial inconsistency and the "self-incrimination dilemma"—are simply no longer compelling. For the reasons discussed *supra,* there is nothing inherently inconsistent in prosecuting a defendant for criminal possession of an item seized while maintaining that the seizure did not violate any reasonable expectation of privacy in the item on the defendant's part. Moreover, as we have noted, *Simmons* has eliminated the possibility that a defendant's testimony given at a suppression hearing might be used as evidence of guilt at trial.[23] Although *Simmons* did not specifically address whether a defendant's testimony given at a suppression hearing may be used for impeachment purposes at trial, we do not believe that such a possibility justifies the "automatic standing" rule.

It is one thing to protect a defendant from the dilemma of having to testify that there was possession to obtain standing at the cost of having that testimony used to incriminate him at trial. It is an entirely different proposition to give defendant protection against exposure of his lying at trial by denying the use of his suppression motion testimony.

*Smith,* 360 N.W.2d at 847. In any event, whether such testimony may be utilized at trial for impeachment purposes "is an issue which more aptly relates to the proper breadth of the *Simmons* privilege, and not to the need for retaining automatic standing." *Salvucci,* 448 U.S. at 94, 100 S.Ct. 2547. It is certainly not a reason to exempt defendants charged with possessory offenses from the *Katz/Rakas* analysis.

In sum, we do not believe that "logic and a sound regard for the purposes of" article I, section 7 of the Hawai'i Constitution requires us to dispense with the *Katz/Rakas* analysis and adopt the "automatic standing" rule for defendants charged with possessory offenses. To the contrary, we believe that article I, section 7 protects persons only from infringements of their *own* reasonable expectations of privacy, regardless of the offense with which they are charged.

As we have noted, the record in the present matter lacks *any* indication, express or implied, that Tau'a, at any point, exhibited an actual, subjective expectation of privacy in the cab of the truck, into which Ben intruded when he leapt into the vehicle. Upon such a barren record, we cannot say that Tau'a, a mere passenger (perhaps even an unauthorized passenger), exhibited an actual, subjective expectation of privacy in the vehicle, much less an expectation that society would recognize as objectively reasonable. Accordingly, Tau'a did not carry his burden of establishing that his own constitutional rights were violated or, put differently, that when Ben entered the vehicle, *his own privacy* was invaded within the meaning of article I, section 7 of the Hawai'i Constitution.

Thus, even assuming that the canine screening might have violated a third party's

---

23. Indeed, *Simmons* also grants a form of "use immunity" to defendants charged with nonpossessory offenses. "[T]he protection of *Simmons* is therefore broader than that of [the automatic standing rule]." *Salvucci,* 448 U.S. at 89–90, 100 S.Ct. 2547.

constitutionally protected right of privacy under article I, section 7, the circuit court was wrong in concluding that the canine screening violated Tau'a's rights. Consequently, the circuit court was also wrong to conclude that the Hawai'i Constitution required suppression of the evidence recovered from the vehicle and Tau'a's subsequent statement to the police.[24]

## IV. CONCLUSION

In light of the foregoing, we vacate the circuit court's order granting Tau'a's motion to suppress and remand for further proceedings.

Dissenting Opinion by RAMIL, J., with whom ACOBA, J., joins.

I join Justice Acoba's forthcoming dissenting opinion. I write separately to direct attention to the majority's inconsistent approach to the issue of standing.

In this court's recent opinion in *State v. Poaipuni*, 98 Haw. 387, 49 P.3d 353 (2002), this court addressed the merits of the case, thereby in effect applying the "automatic standing" rule to Defendant Poaipuni. On May 24, 2002, the Department of the Prosecuting Attorney filed a Motion for Reconsideration. In its Motion, the prosecution argued that the court should reject the "automatic standing" rule and reconsider the matter. On June 21, 2002, the court denied the prosecution's Motion for Reconsideration on the issue of automatic standing.

In an unexpected turn of events, the majority files the present case, in which it re-

jects the "automatic standing" rule that it applied up until just one week prior. Majority at 435–440, 49 P.3d at 1236–1241. The majority makes a specious attempt to distinguish the present case from *Poaipuni* by claiming that Poaipuni "clearly held a reasonable expectation of privacy," Majority at 440 n. 24, 49 P.3d at 1241 n. 24, where Tau'a did not. Majority at 439–440, 49 P.2d at 1240–1241.[1] Defendant Poaipuni denied ownership of and physically relinquished control over the firearms. Furthermore, Poaipuni testified that: (1) the weapons were not his; (2) he did not touch the weapons (they were allegedly carried and deposited into the toolshed by a third party); (3) he never possessed the weapons; and (4) he had no access to the weapons ("The whole purpose of putting 'em in [the toolshed] is because it's going to be locked and nobody can get in there except my Dad."). In comparing the two cases, it is incomprehensible that Tau'a, who was present in the vehicle, did not have an expectation of privacy, but Poaipuni, who essentially admitted that he had no expectation of privacy, somehow did.

It is disturbing to me that the majority could issue two diametrically contradictory rules within a one-week span. The correct rule is that the automatic standing that we applied to Poaipuni should also be applied to Tau'a in the present case. Accordingly, I respectfully dissent.

Dissenting Opinion of ACOBA, J., with whom RAMIL, J., Joins.

Because I believe that the rule adopted in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421,

---

**24.** Because we hold that the search in the present matter did not infringe Tau'a's reasonable expectation of privacy, his subsequent statement to the police obviously cannot constitute "tainted fruits of [an] initial unlawful search and seizure." The present matter is, therefore, distinguishable from *State v. Poaipuni*, 98 Haw. 387, 393–394, 49 P.3d 353, 359–360 (2002), in which the majority opinion recently held that evidence and statements obtained by the police as the result of an illegal search of Poaipuni's home, in which he clearly held a reasonable expectation of privacy, were inadmissible as "fruit of the poisonous tree[.]" Quite simply, without an unlawful infringement of a defendant's reasonable expectation of privacy, there is no "poisonous tree," and,

without a "poisonous tree," there can be no "tainted fruits."

**1.** The majority states that "the record in the present matter lacks *any* indication, express or implied, that Tau'a, at any point, exhibited an actual, subjective expectation of privacy in the cab of the truck, into which Ben intruded when he leapt into the vehicle. Upon such a barren record, we cannot say that Tau'a, a mere passenger (perhaps even an unauthorized passenger), exhibited an actual, subjective expectation of privacy in the vehicle, much less an expectation that society would recognize as objectively reasonable." Majority at 439–440, 49 P.3d at 1240–1241 (emphasis in original).

58 L.Ed.2d 387 (1978), and its federal progeny should not be applied as a matter of state constitutional law to instances where a defendant is charged with a possessory crime, I respectfully dissent.[1] In my view, an accused who is in possession of contraband has automatic standing to challenge the legality of any search and seizure by virtue of the protection afforded a person with respect to his or her "effects" under article I, section 7 of the Hawai'i Constitution. In merging the standing question into the expectation of privacy test, *Rakas*, as does the majority, excludes governmental conduct that might otherwise be deemed unconstitutional from judicial safeguards. In other words, the extinction of automatic standing by *Rakas* diminishes the protection afforded against unreasonable searches and seizures *simply by precluding such claims from being raised in the first place.* In light of the considerations set forth *infra*, such an approach is inimical to a reasoned and fair application of our state constitutional protection of a person's effects as against unreasonable searches and seizures. Accordingly, I believe Defendant–Appellee Murphy Tau'a (Defendant) had standing to raise the unconstitutionality of the search which resulted in the charges against him.

In that regard, it is undisputed that the entry into the van by Ben, the police narcotics dog who alerted to contraband, was without probable cause or a warrant. Legally, Ben was only an extension of his police handler. The contention that Ben entered the open van which had been secured by police of "his own free will" strains credulity but, on its face alone, does not excuse the government's intrusion so as to make the entry legal. There is no excited canine exception to probable cause and warrant requirements under our state constitution.

## I.

Following *Rakas*, the majority holds that, to establish standing to suppress evidence, "a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched, and that his or her expectation is reasonable[.]" Majority opinion at 434, 49 P.3d at 1235 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (brackets omitted)). A synopsis of the federal case law discussing this rule is beneficial.

## A.

Prior to *Rakas*, the United States Supreme Court, in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), held that a defendant who is charged with a possessory crime, had standing to challenge a police search. In *Jones*, federal agents executing a search warrant recovered narcotics and drug paraphernalia "in a bird's nest in an awning just outside a window" of the apartment where defendant was arrested. *Id.* at 258–59, 80 S.Ct. 725. The defendant moved to suppress the officers' discovery on

1. I agree with the decision to publish this opinion. In my view, the majority departs from the law previously applied in this jurisdiction with respect to standing in possessory crime cases. An opinion should be published when it includes a departure from existing law. *See* 4th Cir. R. 36(a) (stating that an opinion will be published if it "establishes, alters, modifies, clarifies, or explains a rule of law within [the Fourth] Circuit"); 5th Cir. R. 47.5.1 (setting forth that an opinion is published if it "alters, or modifies an existing rule of law"); 6th Cir. R. 206(a) (stating that "whether [a decision] ... alters or modifies an existing rule of law" is one of the criteria "considered by panels in determining whether a decision will be designated for publication in the Federal Reporter"); 7th Cir. R. 53(c)(1) (stating that "[a] published opinion will be filed when the decision ... changes an existing rule of law"); Cal. R. Ct. 976(a) (describing that no opinion of the Court of Appeals of other appellate depart- ment shall be published unless it "modifies or criticizes with reasons given, an existing rule" or "resolves or creates an apparent conflict in the law," or fulfills other criteria); Mich. Ct. R. 7.215(A)-(B) (stating that "[a] court opinion must be published if it: ... (3) alters or modifies an existing rule of law[;] ... (7) creates or resolves an apparent conflict of authority, whether or not the earlier opinion was reported"); Tenn. Ct. App. R. 11 (explaining that an opinion "shall be published only if, in the determination of the members of [the Court of Appeals], it meets one or more of the following criteria: (1) the opinion establishes a new rule of law or alters or modifies an existing rule"); Wis. Stat. § 809.23(1)(a) (stating that "[w]hile neither controlling nor fully measuring the court's discretion, criteria for publication in the official reports of an opinion of the court include whether the opinion: 1. ... modifies, clarifies or criticizes an existing rule").

442

the ground that the search warrant had been issued without probable cause. *See id.* at 258, 259, 80 S.Ct. 725. The government maintained that the defendant did not have standing to challenge the search warrant "because [the defendant] alleged neither ownership of the seized articles nor an interest in the apartment greater than that of an 'invitee or guest.'" *Id.* at 259, 80 S.Ct. 725.

In rejecting the government's position, the majority first examined Federal Rules of Criminal Procedure (FRCrP) Rule 41(e), which, at that time allowed "a person aggrieved by an unlawful search and seizure" to challenge the search in a motion to suppress.[2] *See id.* at 260–61, 80 S.Ct. 725. *Jones* explained that, to be "aggrieved," one "must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice ... as a consequence of a search or seizure directed at someone else." *Id.* at 261, 80 S.Ct. 725. While acknowledging that, "[o]rdinarily, ... it is ... proper to require [under Rule 41(e) ] ... that [the movant] establish that he [or she] himself [or herself] was the victim of an invasion of privacy[,]" it was discerned that "prosecutions like this one have presented a special problem." *Id.* The problem noted was that, "[t]o establish 'standing,' Courts of Appeals have generally required that the movant claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched." *Id.* at 261, 80 S.Ct. 725. The Court indicated that, "[s]ince narcotics charges like those in the present indictment may be established through proof solely of possession[,] ... a defendant seeking to comply with what has been the conventional standing requirement has been forced to allege facts the proof of which would tend ... to convict him [or her]." *Id.* at 261–62, 80 S.Ct. 725. This approach left defendants in the precarious position of having to choose between their fourth amendment right against unreasonable searches, and fifth amendment right against self incrimination, inasmuch as the defendant had to first admit that he or she possessed the contraband seized in order to challenge a search. *See id.*

The Court also observed that, "to hold that petitioner's failure to acknowledge interest in the narcotics or the premises prevented his attack upon the search, would be to permit the Government to have the advantage of contradictory positions as a basis for conviction." *Id.* at 263, 80 S.Ct. 725. Finally, noting an apparent unfairness inherent in the traditional standing rule, the *Jones* court observed that, "[i]t is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power

2. At the time of *Jones*, FRCrP Rule 41(e) read:

> *A person aggrieved by an unlawful search and seizure may move* the district court for the district in which the property was seized for return of the property and *to suppress* for use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed.

The current FRCrP Rule 41(e) is similar. It now reads:

> *A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property* on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings. *If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress* under Rule 12.0

(Emphases added.) The parallel Hawai'i Rule of Penal Procedure (HRPP) Rule 41(e) embodies the same requirements as the federal rule regarding suppression of evidence:

> **(e) Motion for Return of Property and to Suppress Evidence.** *A person aggrieved by an unlawful search and seizure may move the court* having jurisdiction to try the offense for the return of the property, or *to suppress for use as evidence anything so obtained,* or both. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. *If the motion is granted the property* shall be restored unless otherwise subject to lawful detention and it *shall not be admissible in evidence at any hearing or trial.*

(Boldfaced type in original.) (Emphases added.)

by the Government." *Id.* at 263–64, 80 S.Ct. 725.

The Court, thus, held that the defendant was entitled to standing under one of two theories—he was charged with a possessory offense, and, thus, he should automatically be awarded standing, or he was legitimately on the premises at the time of the search:

> Two separate lines of thought effectively sustain defendant's standing in this case. (1) *The same element in this prosecution which has caused a dilemma, i.e., that possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged.* (2) Even were this not a prosecution turning on illicit possession, the *legally requisite interest in the premises* was here satisfied, for it need not be as extensive a property interest as was required by the courts below.

*Id.* at 263, 80 S.Ct. 725 (emphases added). The first of these theories was denominated the "automatic standing" rule. *Jones* concluded that "[t]he possession on the basis of which petitioner is and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)." *Id.* at 264, 80 S.Ct. 725.

### B.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court reviewed the dilemma between conflicting assertions of a defendant's fourth amendment and fifth amendment rights discussed in *Jones.* In that case, a petitioner, charged with robbery, sought to exclude evidence contained in a suitcase found at the home of a co-conspirator's mother. *See id.* at 380, 88 S.Ct. 967. In order to establish standing, the petitioner testified at a pre-trial suppression hearing that the clothes in the suitcase belonged to him, and that, although he could not positively identify the suitcase as his, it looked similar to one he owned. *See id.* The trial court denied his motion to

suppress and admitted his pre-trial testimony against him at trial.

The petitioner appealed, arguing that admission of his pre-trial standing testimony at trial was reversible error. Relying on *Jones,* the Court agreed, explaining that the trial court had compelled him to choose between his fourth and fifth amendment rights, inasmuch as "[the petitioner] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* at 394, 88 S.Ct. 967. Finding "it intolerable that one constitutional right should have to be surrendered in order to assert another[,]" the Court held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his [or her] testimony may not thereafter be admitted against him [or her] at trial on the issue of guilt unless he [or she] makes no objection." *Id.*

In *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the Court in dicta suggested that *Simmons* had resolved the defendant's dilemma of having to choose between fourth and fifth amendment rights as it had been posed in *Jones:*

> The self-incrimination dilemma, so central to the Jones decision, can no longer occur under the prevailing interpretation of the Constitution. Subsequent to *Jones,* in *Simmons v. United States, supra,* we held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to establish standing to move to suppress evidence.

*Brown,* 411 U.S. at 228, 93 S.Ct. 1565 (emphasis added). The *Brown* court, however, explained that "it [was] not necessary . . . [then] to determine whether . . . *Simmons* . . . makes *Jones'* 'automatic' standing unnecessary[,]" *id.,* and chose to "reserve that question for a case where possession at the time of the contested search and seizure is 'an essential element of the offense . . . charged.'" *Id.* (quoting *Simmons,* 390 U.S. at 390, 88 S.Ct. 967).[3]

---

3. Chief Justice Burger, writing for the majority, divined a three-fold test to determine whether a

person has standing to challenge a search:

## C.

The *Rakas* decision which followed, authored by then-Justice Rehnquist, merged the concept of standing into the fourth amendment. There, police stopped a vehicle believed to be the getaway car used in a robbery. *See Rakas,* 439 U.S. at 130, 99 S.Ct. 421. After ordering the defendants and two other occupants out of the vehicle, the police searched the car and found rifle shells in a locked glove compartment and a rifle under the front passenger seat. *See id.* The defendants moved to suppress this evidence but did not assert that they owned either the car or the items seized. *See id.* In rendering its opinion, the 5–4 majority in effect abrogated the "automatic standing" rule by equating standing with whether a defendant's personal fourth amendment rights were violated:

> [H]aving ... reaffirmed the principle that *the "rights assured by the Fourth Amendment are personal rights, which may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure,"* Simmons [ ], 390 U.S. [at] 389, 88 S.Ct. 967, the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim....

*Id.* at 138–39, 99 S.Ct. 421 (brackets and ellipsis points omitted) (emphasis added). Thus, it was explained that "the question is whether the challenged search and seizure ... has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.Ct. 421.

In that connection, the Court also jettisoned the "legitimately on the premises" standing status referred to in *Jones,* on the ground that the standard "creates too broad a gauge for measurement of Fourth Amendment rights." *Id.* at 142, 99 S.Ct. 421. However, the Court discerned in *Jones* a "legitimate expectation of privacy" test, wherein a person who had such an expectation in the premises searched "could claim the protection of the Fourth Amendment[.]"[4] *Id.* at 143, 99 S.Ct. 421. Applying this test, the Court noted that the defendants "made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car," where the gun and the shells were found, and that, "[l]ike the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.* at 148–49, 99 S.Ct. 421 (citation omitted). It was thus concluded that "it was unnecessary to decide whether the search of the car might have violated the rights secured to someone else by the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at 150, 99 S.Ct. 421.

In dissent, Justice White, joined by Justices Brennan, Marshall, and Stevens, expressed concern that the *Rakas* majority had "declare[d] an 'open season' on automobiles" because, pursuant to *Rakas,* "[h]owever unlawful stopping and searching a car may be, absent a possessory or ownership interest, no 'mere' passenger may object, regardless of his [or her] relationship to the owner." *Id.* at 157 (White, J., concurring).

## II.

The *Jones* automatic standing rule was overruled in a majority opinion authored again by Justice Rehnquist in *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). There, the defendants, charged with unlawful possession of stolen

---

[T]here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) *were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.*

*Brown,* 411 U.S. at 229, 93 S.Ct. 1565 (emphasis added). Accordingly, in Chief Justice Burger's view, possession was still an essential component of standing requirements.

4. The *Rakas* court also relied on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), to determine the "scope of the interest protected by the Fourth Amendment," and to adopt the legitimate expectation of privacy test. *Rakas,* 439 U.S. at 143, 99 S.Ct. 421.

mail, claimed automatic standing pursuant to *Jones*, and sought to suppress the mail, which had been found in an apartment rented by the mother of one of the defendants. *See id.* at 85, 100 S.Ct. 2547. Relying on *Rakas*, *Salvucci* reiterated "that defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have been in fact violated." *Id.* at 85, 100 S.Ct. 2547.

The majority also confirmed that "[t]he 'dilemma' [between fourth and fifth amendment rights] identified in *Jones*, that a defendant charged with a possessory offense might only be able to establish his [or her] standing ... by giving self-incriminating testimony admissible as evidence of his [or her] guilt, was eliminated by our decision in *Simmons*." *Id.* at 89, 100 S.Ct. 2547. Additionally, addressing the second concern raised in *Jones*, it said that *Rakas* "clearly establish[es] that a prosecutor may simultaneously maintain that a defendant criminally possessed the seized good, but was not subject to a Fourth Amendment deprivation, without legal contradiction." *Id.* at 90, 100 S.Ct. 2547. However, it left unanswered the *Jones* assessment that "[i]t is not consonant with the amenities ... of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government." *Jones*, 362 U.S. at 264, 80 S.Ct. 725.

Justice Marshall responded, in his dissent in *Salvucci*, that the "automatic standing" rule more appropriately protects defendants from the conflict between asserting their fourth and fifth amendment rights because, despite *Simmons*, there remained a threat that a defendant's testimony adduced at a pre-trial suppression hearing could either be used as impeachment at trial, or would offer the prosecution insight into the defense trial strategy:

> *I cannot agree that Simmons* provides complete protection against the "self-incrimination dilemma," *Brown*, 411 U.S. [at] 228, 93 S.Ct. 1565. Respondents contend that the testimony given at the suppression hearing might be held admissible for impeachment purposes and, while acknowl-

edging *that that question is not before us in this case, the majority broadly hints that this is so. The use of the testimony for impeachment purposes would subject a defendant to precisely the same dilemma,* unless he [or she] was prepared to relinquish his [or her] constitutional right to testify in his own defense, and would thereby create a strong deterrent to asserting Fourth Amendment claims. One of the purposes of *Jones* and *Simmons* was to remove such obstacles. Moreover, *the opportunity for cross-examination at the suppression hearing may enable the prosecutor to elicit incriminating information beyond that offered on direct examination* to establish the requisite Fourth Amendment interest. *Even if such information could not be introduced at the subsequent trial, it might be helpful to the prosecution in developing its case or deciding its trial strategy. The furnishing of such a tactical advantage to the prosecution should not be the price of asserting a Fourth Amendment claim.*

*Salvucci*, 448 U.S. at 96–97, 100 S.Ct. 2547 (Marshall, J., dissenting, joined by Brennan, J.) (some internal citations omitted) (emphases added). The *Salvucci* majority did not respond to the dissent's concern that, (1) despite *Simmons*, prosecutors may be able to use pre-trial suppression testimony for impeachment, or (2) from such testimony, prosecutors could gain insight into the defense case.

Finally, *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), again written by then-Justice Rehnquist, decided the same day as *Salvucci*, viewed *Rakas* as requiring that a defendant show "that he or she possessed a 'legitimate expectation of privacy' in the *area* searched" in order to establish a fourth amendment interest sufficient to move for suppression of contraband. *Rawlings*, 448 U.S. at 104, 100 S.Ct. 2556 (emphasis added). There, police officers ordered the occupant of a house subject to a search warrant to empty her purse. *See id.* at 101, 100 S.Ct. 2556. She did so, revealing several drugs. *See id.* The police then demanded that the defendant identify which of the purse's contents were his. *See id.* The

defendant acknowledged ownership of all of the drugs and was eventually indicted for possession with intent to sell the drugs. *See id.* The *Rawlings* majority concluded that the defendant "bears the burden of proving not only that the search of [the] purse was illegal, but also that he had a legitimate expectation of privacy in the purse," held that he had failed to do so, and sustained admission of the drugs against him. *Id.* at 104, 105, 100 S.Ct. 2556 (citations omitted).

In dissent, Justice Marshall pointed out that the majority opinion ignored the plain language of the fourth amendment, which encompasses protections against unreasonable searches and seizures of "effects":

*The Fourth Amendment, it seems to me, provides in plain language that if one's security in one's "effects" is disturbed by an unreasonable search and seizure, one has been the victim of a constitutional violation; and so it has always been understood.* Therefore the Court's insistence that in order to challenge the legality of the search one must also assert a protected interest in the premises is misplaced.

*Id.* at 117–18, 100 S.Ct. 2556 (Marshall, J., dissenting) (emphasis added). According to Justice Marshall, whereas the Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, *and effects,* against unreasonable searches and seizures," *id.* at 117, 100 S.Ct. 2556 (emphasis added), a possessory interest in an item, *i.e.,* an "effect," is a sufficient basis for establishing a person's standing to challenge the legality of a search. "The interest in the

item seized is quite enough to establish that the defendant's personal Fourth Amendment rights have been invaded by the government's conduct." *Id.* at 118, 100 S.Ct. 2556.[5]

### III.

### A.

In *State v. Abordo,* 61 Haw. 117, 596 P.2d 773 (1979), this court adopted the *Rakas* rule in a *non-possession* case:

[I]n a case such as the one at bar, the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his [or her] own Fourth Amendment rights were violated by the search and seizure sought to be challenged. *Rakas [ ],* 439 U.S. [at] 133–41, 99 S.Ct. 421[.]

*Abordo,* 61 Haw. at 120–21, 596 P.2d at 775 (emphasis added). In *Abordo,* the defendant was charged with unauthorized control of a propelled vehicle. *See id.* at 117, 596 P.2d at 774. The defendant sought to suppress the vehicle identification number (VIN) of the stolen car, which was found when the police entered the unlocked and unattended car. *See id.* at 119, 596 P.2d at 774. The defendant returned to the car and drove it away. *See id.* After they confirmed that the car was stolen, through a check of the VIN, the police stopped the vehicle. *See id.*

The State argued that the defendant did not have standing to contest the search. *See id.* at 120, 596 P.2d at 775. Referring to *Rakas,* the *Abordo* court noted that the Unit-

---

5. One commentator has theorized that the United States Supreme Court treats fourth amendment rights as "individual" ones but fourth amendment remedies as "collective," resulting in a distortion of the purposes of the fourth amendment:

The fourth amendment was intended both to protect the rights of individuals and to prevent the government from functioning as in a police state. . . .

. . . .

[T]he Court has refused to consider fourth amendment claims of persons unable to show invasions of their personal privacy, even though their legal positions were clearly prejudiced by the government's misconduct. [*See, e.g., Rawlings [ ], [supra ]; United States v. Salvucci, [supra.]* . . . When the Court speaks

of fourth amendment rights, it speaks only of individuals; when it speaks of remedies, it speaks only of society as a collective unit. Clearly the Court is operating under different and inconsistent theories of fourth amendment rights and remedies.

. . . .

The Court should alter this situation by focusing on underlying fourth amendment values. . . . *The ultimate question is whether the courts should ever permit the government to benefit from its unlawful activities.*

D. Doernberg, *"The Right of the People": Reconciling the Collective and Individual Interests under the Fourth Amendment,* 58 N.Y.U. L.Rev. 259, 260, 282–83, 294 (1983) (emphases added) (footnotes omitted).

ed States Supreme Court had reasoned that "[r]igorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of 'standing,' will produce no additional situations in which evidence must be excluded." *Id.* at 121, 596 P.2d at 775–76 (quoting *Rakas,* 439 U.S. at 139, 99 S.Ct. at 428 (footnote omitted)). According to this court, "[a]nalyzed in this perspective, *[the court's] initial inquiry* is whether the search and seizure that appellant ... challenge[d] infringed on any personal interest which the Fourth Amendment was designed to protect." *Id.* (emphasis added). It was held that, "[a]lthough [the defendant] may have had an actual expectation of privacy with respect to the particular portion of the vehicle searched, ... such an expectation was not one which society is willing to recognize as legitimate." *Id.* at 123, 596 P.2d at 777 (citations omitted).

The *Abordo* court, however, distinguished the case before it from one in which a possessory crime was involved as to which a rule of "automatic standing" would apply:

> Of course, *had the appellant in this case been charged with a possessory crime* (i.e., a crime for which possession is an essential element), *the rule of "automatic standing"* established in *Jones [ ],* 362 U.S. at 261–65, 80 S.Ct. 725, *may have been invoked and, under such circumstances, the need for this type of inquiry would be vitiated.*

*Abordo,* 61 Haw. at 121 n. 3, 596 P.2d at 776 n. 3 (emphases added). Thus, in contradistinction to non-possessory crimes, our jurisdiction retained the "automatic standing" rule in *Jones.*[6] In that regard, the majority repeatedly states that Defendant failed to satisfy the reasonable expectation of privacy criteria in *Rakas. See* majority opinion at 433, 435, 439, 49 P.3d at 1234, 1236, 1240. But Defendant's position is understandable in light of the fact that up until the majority's reversal in this case, *Abordo* expressly said

that possessory crime charges were distinguished from *Rakas* and subject to an automatic standing rule. Additionally, as Justice Ramil aptly points out in his dissenting opinion with which I joined, this court recently issued *State v. Poaipuni,* 98 Haw. 387, 49 P.3d 353 (2002), which supports the automatic standing rule. Poaipuni was charged with a possessory crime based on firearms which were found in a case in a shed in which he had no legitimate expectation of privacy. *Id.* at 98 Haw. at 390, 49 P.3d at 356. *Both the majority and dissent* assumed that Poaipuni had automatic standing.

### B.

The "automatic standing" rule is to be distinguished from the "legitimate expectation of privacy" test. Under the former, whether a defendant charged with a possessory crime has a legitimate expectation of privacy in an area searched is irrelevant as to whether he or she has standing to challenge a search. Thus, charged possession of an "effect" would be a sufficient basis to raise an unreasonable search and seizure challenge. Justice Marshall distinguished the two rules in his dissent in *Rawlings:*

> *Jones v. United States, supra,* is quite plainly premised on the understanding that an interest in the seized property is sufficient to establish that the defendant "himself was the victim of an invasion of privacy."* 362 U.S., at 261, 80 S.Ct. 725. The Court observed that the "conventional standing requirement," *id.,* at 262, 80 S.Ct. 725, required the defendant to "claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched," *id.,* at 261, 80 S.Ct. 725. The Court relaxed that rule for defendants charged

---

6. Hawai'i cases subsequent to *Abordo* that have applied the *Rakas* rule to the question of standing have not involved charges of criminal possession. *See, e.g., State v. Scanlan,* 65 Haw. 159, 160–61, 649 P.2d 737, 738 (1982) (robbery); *State v. Narvaez,* 68 Haw. 569, 573, 722 P.2d 1036, 1038 (1986) (robbery; applying *Rakas* standing rule to fifth amendment question); *State v. Araki,* 82 Hawai'i 474, 483, 923 P.2d 891, 900 (1996) (pro-

moting pornography for minors). Thus, the majority's assertion that "this court has generally avoided reliance on *Jones,*" majority opinion at 437, 49 P.3d at 1238, while seemingly correct, does not point out that our appellate courts have not accepted the opportunity to address standing as it relates to *possessory* crimes, rendering mention of *Jones* unnecessary in those other cases.

with possessory offenses because "[t]he same element ... which has caused the dilemma, *i.e.*, that *possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized,* which ordinarily required when standing is challenged. *Id.*, at 263 [80 S.Ct. 725] (emphasis supplied). *Instead, "[t]he possession on the basis of which petitioner is to be and was convicted suffices to give him standing* [,]" *id.* at 264 [80 S.Ct. 725].

448 U.S. at 116–17, 100 S.Ct. 2556 (Marshall, J., dissenting) (ellipsis points in original) (some emphases added). The majority suggests that the doctrine of automatic standing and the concept of the legitimate expectation of privacy cannot coexist. *See* majority opinion at 437–439, 49 P.3d at 1238–1240. However, *Abordo* and other case law indicate otherwise. While *Abordo* applied the legitimate expectation of privacy test, it excepted possessory crime cases as to which the automatic standing doctrine would apply. As the majority acknowledges, "Montana ... has ... adopted the 'automatic standing' rule while utilizing the 'legitimate expectation of privacy' analysis[.]" Majority opinion at 437, 49 P.3d at 1238 (citing *State v. Bullock*, 272 Mont. 361, 901 P.2d 61, 67, 69–70, 75–76 (Mont.1995)). Contrary to the majority's representation otherwise, so has Washington. *Compare State v. Goucher*, 124 Wash.2d 778, 881 P.2d 210, 212 (Wash.1994) (explaining that the Washington test "include[s the] legitimate privacy expectations protected by the Fourth Amendment") with *State v. Jones*, 45 P.3d 1062, 1065 (Wash.2001) (applying automatic standing to possessory crime).

Moreover, the majority's statement that, "[q]uite simply, '[a] criminal defendant always has standing to challenge the admission of evidence introduced by the state[,]' " majority opinion at 435 n. 19, 49 P.3d at 1236 n. 19 (quoting *State v. Tanner*, 304 Or. 312, 745 P.2d 757, 759 (Or.1987)), is contradicted by its own holding. "Standing" is defined as "a position from which one may assert or enforce legal rights and duties." *Webster's Collegiate Dictionary* 1146 (10th ed.1993). Thus, for example, a criminal defendant only has standing where he or she may challenge the constitutionality of a search. *See State v. Bruns*, 172 N.J. 40, 796 A.2d 226, 229 (N.J. 2002) ("Generally speaking, [standing] requires a court to inquire whether defendant has interests that are substantial enough to qualify him as a person aggrieved by the allegedly unlawful search and seizure.") The majority has held that Defendant has no such standing. Indeed, the appellate courts of this state have previously determined in some instances that defendants do not have standing to challenge a search. *See State v. Araki*, 82 Hawai'i 474, 484, 923 P.2d 891, 901 (1996) ("[W]e hold that Araki lacks standing to challenge the seizure of the search warrant evidence."); *State v. Mahone*, 67 Haw. 644, 648, 701 P.2d 171, 175 (1985) ("One has no standing to complain of a search of property he [or she] has voluntarily abandoned." (Citation omitted.)).

## IV.

### A.

I believe the rule of automatic standing is preferable in cases of possessory crimes. I would adopt the underlying rationale of Justice Marshall's dissent in *Rawlings* under our parallel unreasonable search and seizure prohibition in article 1, section 7 of the Hawai'i Constitution on independent state grounds.[7] Because the plain language of that section protects "effects"[8] from unreasonable

---

7. Article I, section 7 of the Hawai'i Constitution, in relevant part states that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated[.]"

8. The United States Supreme Court has explained that "[t]he Framers [of the United States Constitution] would have understood the term 'effects' to be limited to personal, rather than real, property." *Oliver v. United States*, 466 U.S. 170, 177 n. 7, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). With this definition in mind, the Sixth Circuit characterized property as "personal property since they are *movable*" and determined that "[a]s such they fall within the definition of effects in *Oliver* and are therefore expressly afforded protection by the fourth amendment." *Allinder v. Ohio*, 808 F.2d 1180, 1186 (6th Cir. 1987) (emphasis added) (footnote omitted). I

searches, an individual who was allegedly in possession of contraband is entitled to automatic standing for the purpose of challenging the search or seizure involved.[9]

Article I, section 7 of the Hawai'i Constitution affords the people of this state greater protection than does the fourth amendment of the United States Constitution. *See State v. Tanaka*, 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."). That provision of the Hawai'i Constitution expressly grants the people of our state protection in their "effects," as it does in their persons, houses, and papers, against unreasonable searches and seizures. It would render the text nugatory if the assertion of that right was abrogated, contrary to the "plain meaning" of article I, section 7. *See State v. Alston*, 88 N.J. 211, 440 A.2d 1311, 1319 (N.J.1981).

The right to be free from unreasonable searches and seizures in their effects "defines a right [of our people] dependent on a possessory interest in such effects[.]" *State v. Wood*, 148 Vt. 479, 536 A.2d 902, 908 (1987). Thus, the charge that Defendant possessed such items, *i.e.*, they were his effects, implicates the constitutional protection with respect to such objects. Consequently, possession itself is enmeshed in the protection afforded effects. It follows that such charged conduct logically must confer with it the right to assert the protection granted in

connection with a person's effects. By virtue of one's possession, the items became subject to the constitutional reach of article I, section 7.

Whereas the right involving effects arises as a result of the charged possession, possession in and of itself should "suffice[ ] to give [Defendant] standing," *Rawlings*, 448 U.S. at 117, 100 S.Ct. 2556 (Marshall, J., dissenting) (internal quotation marks and citation omitted), to raise that right. Thus, in asserting the right, there is no necessity that Defendant demonstrate "an interest in the premises searched or the property seized [as would] ordinarily [otherwise be] required." *Jones*, 362 U.S. at 263, 80 S.Ct. 725. In the instant case, Defendant would thus have standing under our constitution to challenge the admissibility of objects he was charged with possessing because those items fall within the protection afforded his "effects."

Additionally, the automatic standing rationale in *Jones* easily conforms to our own HRPP Rule 41(e). Like FRCrP Rule 41(e), HRPP Rule 41(e) states that "[a] person aggrieved by an unlawful search and seizure may move the court . . . to suppress for use as evidence anything so obtained[.]" As *Jones* stated, "possession on the basis of which petitioner is and was convicted suffices to give him standing under any *fair and rational* conception of the requirements of Rule 41(e)." *Id.* at 264, 80 S.Ct. 725 (emphasis added). A person subject to conviction for possession of evidence obtained in a

---

would adopt the same definition of "effects," for purposes of article I, section 7 of the Hawai'i Constitution, as "movable personal property."

9. Adaptations of the automatic standing rule have been adopted in other states. For example, Pennsylvania has indicated that, if a defendant meets any one of four factors, he or she will be eligible for automatic standing:

[A] defendant must allege one of the following "personal" interests in order to establish standing: (1) his [or her] presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence improperly seized; (3) that the offense charged include as an element of the prosecution's case, the element of possession at the time of the contested search and seizure; or (4) a proprietary or possessory interest in the searched premises.

*Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 378 (Pa.1986) (citation omitted), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). Alternatively, the Vermont Supreme Court has stated that "a defendant need only assert a possessory, proprietary, or participatory interest in the item seized or the area searched to establish standing to assert [a search or seizure] challenge." *State v. Wood*, 148 Vt. 479, 536 A.2d 902, 908 (1987) (citations omitted). Meanwhile, Washington has instituted a more narrow test than Pennsylvania and Vermont. *See Jones*, 45 P.3d at 1064 ("To assert automatic standing a defendant (1) must be charged with an offense that involves possession as an essential element; and (2) must be in possession of the subject matter at the time of the search or seizure." (Citation omitted.)).

search that would otherwise be illegal would be "aggrieved." Thus, under HRPP Rule 41(e), alleged possession of an item should be sufficient to grant a person standing to challenge an unlawful search.

### B.

The majority posits examples as to "absurd results" stemming from an automatic standing rule. Majority opinion at 438, 49 P.3d at 1239. None of these, however, are remotely apropos. One "who leaves evidence in a place readily accessible to the public[,]" majority opinion at 438, 49 P.3d at 1239, could not claim the protection against unreasonable searches since exploration of public areas are not "searches" under article I, section 7 of the constitution. *See State v. Wallace,* 80 Hawai'i 382, 394, 910 P.2d 695, 707 (1996) ("As a general matter, a 'search' implies that there is an exploration for an item or that the item is hidden." (Brackets, internal quotation marks, and citation omitted.)). Similarly, "a thief of an automobile" need not "assert the constitutional rights of the true owner of the automobile as a predicate for suppression of the evidence seized therein," majority opinion at 439, 49 P.3d at 1240, inasmuch as the right to do so inheres in the "effects" concerned. Finally, one "who deposits illegal contraband on a neighbor's porch," majority opinion at 439, 49 P.3d at 1240, has abandoned the item and is not in possession of it. These examples beg the question. They assume the application of the expectation of privacy test, the proposition that is in dispute in the first place.

### C.

Other jurisdictions have adopted Justice Marshall's view that a constitutional prohibition against unreasonable searches and seizures of a person's effects confers automatic standing in possessory crime cases. The New Jersey Supreme Court has held that defendants charged with possessory crimes must be afforded automatic standing consistent with the plain language of its constitution and in light of the policies underlying the law of searches and seizures:

Moreover, we are concerned that the results thus attained [by applying *Rakas* ] will not infrequently run contrary to a fundamental principle rooted in Article I, paragraph 7 of the New Jersey Constitution. That paragraph protects "the right of the people to be secure in their persons, houses, papers and *effects,* against unreasonable searches and seizures." *Hence, a person's ownership of or possessory interest in personal property seized by law enforcement officials is quite sufficient to confer standing* to claim that personal Fourth Amendment privacy rights have been violated. *See Rawlings [ ],* 448 U.S. [at] 116–19, 100 S.Ct. 2556 (Marshall, J., dissenting). *We find the reasoning of Justice Marshall in his dissent in Rawlings, that the constitutional protection against unreasonable searches and seizures extends to people's "effects" as well as to their "persons" and "houses," more faithful to the authoritative precedents and policies underlying the law of searches and seizures, and more consonant with our own interpretation of the plain meaning of Article I, paragraph 7 of our State Constitution. See State v. Ercolano,* 79 N.J. 25, 397 A.2d 1062 [ (N.J.1979) ].

*Alston,* 440 A.2d at 1319 (emphasis omitted) (emphases added) (footnote omitted). The Vermont Supreme Court held that the same rationale applies to the Vermont Constitution's protection from unreasonable searches:

Article Eleven itself establishes the scope of the protected right, and defines who may invoke its protection. *The right of the people "to hold themselves, their houses, papers, and possessions, free from search or seizure," defines a right dependent on a possessory interest,* with equal recognition accorded to the item seized and the area intruded upon. By delineating the right as a possessory interest, Article Eleven premises the protected right upon an objectively defined relationship between a person and the item seized or place searched, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy in the area searched.

*Wood,* 536 A.2d at 908 (citations omitted) (emphasis added); *see also Commonwealth v.*

*Sell,* 504 Pa. 46, 470 A.2d 457, 468 (Pa.1983) ("We decline to undermine the clear language of Article I, section 8 [which guarantees '[t]he people shall be secure in their ... possessions from unreasonable searches and seizures,'] by making the Fourth Amendment's amorphous 'legitimate expectation of privacy' standard a part of our state guarantee against unreasonable searches and seizures."); *State v. Settle,* 122 N.H. 214, 447 A.2d 1284, 1285, 1286 (N.H.1982) (explaining that part I, article 19 of the New Hampshire Constitution states, in part, that "[e]very subject hath a right to be secure from all unreasonable searches ... of ... all his [or her] possessions," and holding that "the language of [the New Hampshire C]onstitution requires that 'automatic standing' be afforded to all persons ... who are charged with crimes in which possession of any article or thing is an element" (emphasis omitted)).

Commentators have likewise reasoned that such plain language warrants the application of automatic standing in cases of possessory crimes. *See* D.A. Macdonald, Jr., *Standing to Challenge Searches and Seizures: A Small Group of States Chart Their Own Course,* 63 Temp. L.Rev. 559, 584 (1990) [hereinafter *Standing to Challenge* ] ("Not only does the Court's current standard defeat the purpose of the fourth amendment, but ... [b]y eliminating standing based on a defendant's possessory interest in the item seized, the Court's reading affords protection only against searches of persons and places, and reads the word 'effects' out of the

amendment." (Citation omitted.)); G.G. Ashdown, *The Fourth Amendment and the "Legitimate Expectation of Privacy",* 34 Vand. L. Rev 1289, 1325 (1981) [hereinafter *The Fourth Amendment* ] ("The Court's view of property interests under the fourth amendment is difficult to accept primarily because the language of the fourth amendment directly covers these interests. The amendment expressly speaks to ... 'effects;' *therefore, this constitutional provision is activated whenever an individual's property is seized, irrespective of any privacy interest."* (Emphasis added.)).

## V.

I agree with Justice Marshall that the rule outlined in *Rakas* still forces defendants to choose between their right against unreasonable searches and seizures and their right against self-incrimination at trial despite *Simmons. See* discussion *infra.* Additionally, Justice Marshall's warning—that compelling defendants to testify at suppression hearings in order to assert their right against unreasonable searches and seizures provides the prosecution insight into the defense trial strategy—also remains valid.[10] Similarly, it is "not consonant with the amenities ... of the administration of criminal justice," *Jones,* 362 U.S. at 264, 80 S.Ct. 725, to require defendants charged with possessory crimes to testify regarding their possessory interest before allowing them to assert a constitutional challenge to a search.[11] Thus, if a defen-

**10.** Indeed, in the instant case, under the majority's analysis, Defendant would have had to acknowledge an interest in either the vehicle or the items seized before being allowed to successfully challenge the search as illegal. *See* majority opinion at 435–436, 49 P.3d at 1236–1237. Compelling Defendant to meet such a burden would have provided the prosecution the opportunity to discern Defendant's strategy at trial, *whether or not Defendant in fact chose to testify at trial.* For example, had Defendant testified at the suppression hearing that the gray nylon bag which contained the paraphernalia was his, the prosecution, even if unable to use that specific testimony against Defendant at trial, could have examined its own witnesses regarding whether they had ever seen Defendant with the bag. The prosecution could even have conducted further investigation to locate other witnesses who could vouch that the bag was Defendant's. Such testimony at the suppression hearing in essence

points the prosecution to the elements of the charges, either through investigation or examination at trial. As Justice Marshall stated, "the furnishing of such a tactical advantage to the prosecution should not be at the price of asserting a Fourth Amendment claim." *Salvucci,* 448 U.S. at 97 (Marshall, J., dissenting).

**11.** Jurisdictions have held that automatic standing results in the effective administration of justice and in fair play. According to the New Jersey Supreme Court, the automatic standing rule more comprehensively protects people's rights to be free from unreasonable searches and seizures:

Mindful of our responsibility for making rules affecting the administration of criminal justice in the courts of this State, we find the Supreme Court's grounds for abandoning the *Jones* rule of standing unpersuasive. Rather, we believe that

dant is charged with a possessory crime, justice would require he or she should be able to challenge any improper manner or method by which such evidence was obtained.

## A.

Neither the United States Supreme Court nor the Hawai'i Supreme Court has resolved the question of whether or not a defendant's statements made in the course of a suppression hearing may be used against him or her as impeachment at trial.[12] Whereas this possibility exists, the dilemma for an accused remains as to whether to assert his or her right against unreasonable searches or his or her right against self incrimination.

I note that our appellate courts are allowed to consider transcripts from both the suppression hearing and the trial when faced with the task of reviewing a decision on a motion to suppress. *See State v. Uddipa,* 3 Haw.App. 415, 416–17, 651 P.2d 507, 509 (1982) (" 'In determining whether a trial court erred in admitting evidence claimed to have been illegally seized, an appellate court will usually not limit itself to the testimony received on the pretrial motion to suppress, but will also consider pertinent testimony given at trial.' " (Quoting 3 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 678, at 805 (1982).) (Other citations omitted.))); *State v. Crowder,* 1 Haw.App. 60, 66, 613 P.2d 909, 914 (1980) ("In passing on the validity of the arrest, we have considered the testimony contained in the record of the pretrial hearing on the motion to suppress and the trial itself." (Citations omitted.)); *cf. State v. Villeza,* 72 Haw. 327, 331, 817 P.2d 1054, 1056 (1991) ("[W]e are required to examine the *entire* record and make an inde-

pendent determination of the ultimate issue of voluntariness [of a defendant's statement to the police]." (Citing *State v. Kaahanui,* 69 Haw. 473, 747 P.2d 1276 (1987).) (Other citations omitted.))). Therefore, even if it is improper for the prosecution to introduce a defendant's testimony from a suppression hearing, defendants would continue to face a version of the dilemma *Jones* sought to avoid.

## B.

Other jurisdictions also recognize that, in the absence of automatic standing, defendants are put to the unacceptable choice between their fourth and fifth amendment rights. In *Commonwealth v. Amendola,* 406 Mass. 592, 550 N.E.2d 121 (Mass.1990), the court explained that, despite *Simmons,* the possibility of impeachment deters assertion of rights against unreasonable searches:

We think that the principal concerns of the *Jones* Court remain valid today, despite the current Supreme Court's shift in thinking. The Commonwealth, in order to prove possession, aims to show that the defendant was the driver of the Pontiac and was in possession of the contraband. But in arguing against standing, the Commonwealth claims that the defendant had no connection with the Pontiac and was not in possession of the contraband. *The Commonwealth may not have it both ways.* Furthermore, it would be naive to credit, without any reservations, the defendant's dissociation from the Pontiac. The defendant was faced with the very dilemma discussed by the *Jones* Court. There is too great a risk that the defendant, in order to escape conviction, was

the automatic standing rule is a salutary one which protects the rights of defendants and eliminates the wasteful requirement of making a preliminary showing of standing in pretrial proceedings involving possessory offenses, where the charge itself alleges an interest sufficient to support a Fourth Amendment claim. *Salvucci, supra,* 448 U.S. at 97, 100 S.Ct. 2547 (Marshall, J., dissenting).

*Alston,* 440 A.2d at 1320 (brackets omitted) (emphasis added). *See also Settle,* 447 A.2d at 1286, 1287 (explaining that "the automatic standing rule ... offers several benefits to the sound administration of criminal justice," including the "practical premise that—for the benefit of law

enforcement, the trial courts, and the trial bar—that class of persons who may assert rights against unlawful searches and seizures should be clearly defined").

12. The United States Supreme Court has held that the fruit of an unlawful search may be used to impeach a defendant's trial testimony, rendered in response to proper cross-examination, even where the evidence does not directly contradict his or her testimony on direct examination. *See United States v. Havens,* 446 U.S. 620, 628, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

willing to perjure himself by disclaiming any connection with the Pontiac. In addition, *Simmons, supra,* did not resolve the self-incrimination dilemma. *"The use of the testimony for impeachment purposes would subject a defendant to precisely the same dilemma, unless he [or she] was prepared to relinquish his [or her] constitutional right to testify in his [or her] own defense, and would thereby create a strong deterrent to asserting Fourth Amendment claims." Salvucci,* 448 U.S. at 96, 100 S.Ct. 2547 (Marshall, J., dissenting).

*Id.* at 125–26 (emphases added). *See also, Sell,* 470 A.2d at 468 ("After examining the *Jones* Court's governmental-contradiction rationale for conferring 'automatic standing,' ... we found the reasoning 'compelling[.]'" (Citing *Commonwealth v. Knowles,* 459 Pa. 70, 327 A.2d 19, 22 (1974)); *State v. Simpson,* 95 Wash.2d 170, 622 P.2d 1199, 1206 (Wash. 1980) (explaining that *"Simmons,* as interpreted by the court in *Salvucci,* does not provide sufficient protection against the self-incrimination dilemma," in part because, in Washington, "prior statements made by a defendant are admissible at trial for purposes of impeachment" (citations omitted); hence, "without automatic standing, a defendant will ordinarily be deterred from asserting a possessory interest in illegally seized evidence because of the risk that statement made at the suppression hearing will later be used to incriminate him[,] albeit under the guise of impeachment"). Absent an automatic standing rule applicable to possessory crimes, a defendant may still be placed in the intolerable position of choosing between his or her fourth amendment and fifth amendment rights.[13]

## VI.

As mentioned, Justice White, in his dissent in *Rakas,* pointed out that the majority had declared "open season" on passengers, offering police officers a reason, absent probable cause, to stop and search cars carrying passengers:

> The Court today holds that the Fourth Amendment protects property, not people, and specifically that a legitimate occupant of an automobile may not invoke the exclusionary rule and challenge a search of that vehicle unless he [or she] happens to own or have a possessory interest in it. Though professing to acknowledge that the primary purpose of the Fourth Amendment's prohibition of unreasonable searches is the protection of privacy—not property—the Court nonetheless effectively ties the application of the Fourth Amendment and the exclusionary rule in this situation to property law concepts. *Insofar as passengers are concerned, the Court's opinion today declares an "open season" on automobiles. However unlawful stopping and searching a car may be, absent a possessory or ownership interest, no "mere" passenger may object, regardless of his [or her] relationship to the owner.*

*Rakas,* 439 U.S. at 156–57, 99 S.Ct. 421 (White, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.) (Emphasis added); *see also Simpson,* 622 P.2d at 1206 ("The inability to assert [a privacy interest in cases where a defendant is charged with possession of the item seized] threatens all of Washington's citizens, since no other means of deterring illegal searches and seizures is readily available."); Ashdown, *The Fourth Amendment, supra,* at 1319 ("Presumably, then, [after *Rakas,*] police can now stop and

13. The majority posits that "[a]lthough *Simmons* did not specifically address whether a defendant's testimony given at a suppression hearing may be used for impeachment purposes at trial," majority opinion at 439, 49 P.3d at 1240, "[i]t is an entirely different proposition to give defendant protection against exposure of his lying at trial by denying the use of his suppression motion testimony." *Id.* (quoting *People v. Smith,* 420 Mich. 1, 360 N.W.2d 841, 847 (Mich.1984)). The majority misapprehends the nature of the

issue, that is, pursuing one constitutional right at the expense of the other. In a related context, this court has confirmed a defendant's right against self-incrimination over the collateral effect on the "truth" at trial. *See State v. Santiago,* 53 Haw. 254, 266, 492 P.2d 657, 664 (1971) ("We hold that unless these protective measures are taken [*i.e.,* the reading of *Miranda* rights], statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination.").

search a vehicle without probable cause at will, and the passengers cannot complain because their fourth amendment rights have not been invaded."). The New Jersey Supreme Court, concurring with the foregoing passage in the *Rakas* dissent, explained that the majority holding undermined the deterrent purpose of the exclusionary rule:

> If indeed this is the invitation extended to law enforcement officials by Rakas and its progeny, then it would obviously be destructive of the time-honored principle that the primary purpose of the exclusionary rule is deterrence—"to compel respect for the constitutional guaranty (against unreasonable searches and seizures) in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). *See Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

*Alston,* 440 A.2d at 1318 n. 8 (emphasis added); *see also* Macdonald, *Standing to Challenge, supra* at 586–87 ("Since the purpose of the exclusionary rule is to deter police misconduct, not to remedy violations of an individual's fourth amendment rights, it is irrelevant whose fourth amendment rights were violated." (Citation omitted.)); Ashdown, *The Fourth Amendment, supra* at 1294 ("It seems clear that the refusal to apply the [exclusionary] rule in cases of particular fourth amendment transgressions will produce no incremental deterrence of unlawful police conduct, and inconsistent application of the rule arguably could diminish whatever deterrent value does exist.").

Furthermore, by removing any disincentive to intrude upon passengers' rights, the *Rakas* rule allows for the prosecution to use otherwise tainted evidence in court, a proposition this court has rejected. *See State v. Pattioay,* 78 Hawai'i 455, 468, 896 P.2d 911, 924 (1995) ("The purpose of the exclusionary rule ... is primarily to deter illegal police conduct and secondarily to recognize that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts." (Citing *State v. Santiago,* 53 Haw. 254, 264, 492 P.2d 657, 663 (1971); Hawai'i Revised Statutes § 602–4 (1985).); *cf. State v. Edwards,* 96 Hawai'i 224, 237, 30 P.3d 238, 251–52 (2001) (explaining that the "limited scope of the exclusionary rule" includes violations of "constitutional dimensions" (internal quotation marks and citation omitted); *State v. Bowe,* 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994) ("[W]e hold that admitting coerced confessions, regardless of the source of the coercion, is fundamentally unfair.").

Thus, applying the legitimate expectation of privacy standard to possessory cases as a requirement of standing contravenes the purposes of the exclusionary rule. In the instant case, for example, there was no basis for ordering the passengers out of the vehicle to conduct a narcotics dog sniff. Upon seizing contraband and the passengers' effects, the police could lawfully arrest the passengers for possession under *Rakas* and the majority holding, and the passengers would be unable to object to the order out, detention, and resulting search as unconstitutional.

### VII.

Defendant was charged with several possession crimes. Because the objects he was charged with possessing constituted moveable personal property, the objects were "effects" within the meaning of article I, section 7 of the Hawai'i Constitution. *See supra* note 8. The plain language of that provision protecting Defendant's right against unreasonable searches and seizures with respect to those effects, Defendant must logically have standing to assert such a right. Having determined that "automatic standing" in possessory crimes applies under our constitution and, under the facts, that Defendant would thus have had standing to object to the search in the instant case, I believe that, applying search and seizure law, the court was correct in suppressing the evidence.

### VIII.

The concern of Justice White and the other concurring justices in *Rakas,* that *Rakas* effected an " 'open season' on automobiles," particularly automobile passengers, is exem-

plified in the instant case. As mentioned, the officers did not have a legal basis to order the passengers out of the vehicle or to detain them and the vehicle. When they stopped the truck, the police had, at that point, only an arrest warrant for Yamashita and a search warrant for Yamashita's person. They did not have any warrants for the vehicle at that time, or for any of its occupants, other than Yamashita. A warrantless search of the truck would only be justified by an exception to the warrant requirement. *See State v. Russo,* 67 Haw. 126, 137, 681 P.2d 553, 561 (1984) (" '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (Quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). No such exception existed and the prosecution does not contend there was any.

## IX.

### A.

Officer Gannon and Ben were in the parking lot when Yamashita drove the truck into the lot. Once the police had removed the occupants from the vehicle, "Officer Callinan requested that [Officer Gannon] utilize canine Ben to conduct a screening." Officer Gannon, Ben's handler, explained that Ben was brought to the truck while the door remained open and that Ben entered the vehicle with-

out police command. The officer contended that he could not control Ben and that Ben, of "his own free will," jumped through the truck's open door and "alert[ed]" in the vehicle on the contraband. Officer Gannon admitted his *own* entry into the vehicle would have been illegal. A search warrant for the vehicle was obtained based on Ben's alert within the vehicle.[14]

### B.

Aside from the information Ben signaled to the police, all that the search warrant contained was that (1) a confidential informant "told [the police]" "on the week of December 26, 1999 that Aaron YAMASHITA possessed about one ... pound of Crystal Methamphetamine"; and (2) that the confidential informant "then received instructions by Aaron YAMASHITA to meet at the Eagle HARDWARE within the Maui Market Place on December 28, 1999 at around 4:30 P.M." " 'All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath.' " *State v. Navas,* 81 Hawai'i 29, 34, 911 P.2d 1101, 1106 (App. 1995) (quoting *United States v. Anderson,* 453 F.2d 174, 175 (9th Cir.1971)) (brackets omitted). Because, without Ben's alert, there would be no probable cause to support the issuance of the search warrant of the truck itself, the legal significance of the alert is determinative of the suppression order.

---

**14.** Officer Gannon's affidavit in support of the search warrant contained the following information relating to Ben:

8. That on December 28, 1999, at approximately 4:55 P.M. I was assigned by Sergeant D. MATSUURA of the Maui Police Departments [sic] Canine Division, to assist Officer Michael CALLINAN and other assisting Vice Officers and to *conduct a narcotics screening with my canine "BEN" on the vehicle (MCR 718) utilized by the target of this investigation,* at the Maui Market Place, fronting McDonalds on Ohekani Street, Kahului, Maui, HI;

9. That on December 28, 1999, at approximately 4:55 P.M. Affiant met with the primary investigator Officer Michael CALLINAN of the Maui Police Department Vice Narcotics Unit who apprised me of the following information and *requested that*

*vehicle MCR 718 be screened by a narcotics detection canine;*

. . . .

12. That at approximately 5:03 P.M., Affiant utilized the Maui Police Department's Narcotic Detection Canine "BEN" in screening the red Ford XLT Pickup truck bearing Hawai'i license plate number MCR 718 and that *Affiant observed the Narcotics Detection Canine "BEN" alert between the back seat and the center console within the vehicle,* indicating the presence of an odor of an unknown illegal controlled substance within, *that the drivers [sic] side door was halfway opened prior to my arrival and that Canine "BEN" entered the vehicle on his own free will* [.]

(Emphases added.)

X.

Hawai'i case law has generally held that dog sniffs do not constitute searches. In *State v. Groves*, 65 Haw. 104, 649 P.2d 366 (1982), this court upheld the validity of a dog-sniff of a suspect's luggage after an odor of marijuana was detected, by humans, emanating from the luggage. It was reasoned that "the ... legally sound approach is represented by ... the premise that there can be no reasonable expectation of privacy in the airspace surrounding a person's luggage." *Id.* at 112, 649 P.2d at 371–72 (citations omitted.)

The *Groves* court, however, explained that dog-sniffs can, in certain circumstances, constitute a search:

> While we today hold that the use of narcotics-sniffing dogs does not, in and of itself, constitute an illegal search, this decision is not to be read as a carte blanche sanctioning of all uses of these dogs. *There may be situations in which the use of these dogs will be deemed unreasonable. ...*
>
> *Accordingly, the legality of the use of narcotics-sniffing dogs will depend on the circumstances of the particular case. This court will not condone the use of these dogs in general exploratory searches* or for the indiscriminate dragnet-type searches. *See United States v. Beale*, [674 F.2d 1327,] 1336[ ] n. 20 (9th Cir.1982); *United States v. Klein*, 626 F.2d 22, 27 (7th Cir.1980); *United States v. Bronstein*, [521 F.2d 459,] 465 [ (2nd Cir.), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1975) ] (Mansfield, J., concurring).

*Groves*, 65 Haw. at 113–14, 649 P.2d at 372–73 (citation omitted) (emphasis added).[15]

Other jurisdictions have similarly concluded that dog sniffs can constitute a search.

*See, e.g., United States. v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.1985) (holding that canine sniff at door to dwelling constitutes a search); *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805, 820 (Neb.1999) (holding that canine sniff at door to dwelling constitutes a search); *Commonwealth v. Rogers*, 741 A.2d 813, 818 (Pa.Super.Ct.1999) ("[O]ur Supreme Court has determined that the use of trained dogs to sniff for the presence of drugs does constitute a search under Article 1 § 8 of the Pennsylvania Constitution." (Citation omitted.)); *State v. Dearman*, 92 Wash.App. 630, 962 P.2d 850, 853 (Wash.Ct.App.1998) ("The trial court ... correctly found that using a trained narcotics dog constituted a search for purposes of article 1, section 7 of the Washington Constitution and a search warrant was required.").

In *State v. Haley*, 41 P.3d 666 (Colo.2001), a case similar to the instant one, an officer stopped a car for a traffic violation. The officer eventually decided not to issue a ticket for the violation, and told the driver that he was free to leave, but then immediately asked him if there was any contraband in the car. The driver offered to allow the officer's dog to sniff the luggage the car contained. The officer asked for consent to a dog sniff of the car, but the driver refused, pulling only the luggage from the trunk of the car. The dog did not alert on the luggage. The officer then took the dog to the vehicle, despite the driver's refusal, and the dog alerted to places around the car. A ruckus ensued and the driver and the car's passengers were arrested for possession of drugs. The Colorado Supreme Court held that the dog sniff was an unreasonable search, particularly because

---

**15.** Subsequent to *Groves*, this court applied, in *State v. Snitkin*, 67 Haw. 168, 681 P.2d 980 (1984), a balancing test to determine whether a dog sniff is reasonable. In *Snitkin*, the police utilized a narcotics dog to sniff packages contained in a private delivery service's office, knowing that the office was commonly used as a conduit for drugs. *See id.* at 169, 681 P.2d at 982. After the narcotics dog alerted on a package, the police obtained a search warrant for the package, opened it, found contraband therein, re-closed it, and waited for the defendant to pick up the package before arresting him. *See id.* at 170, 681 P.2d at 982. The court noted that "[the

narcotics dog]'s actions were not public, did not involve human confrontation, and were carried out with much less discretion than could be accomplished by human officers. The packages were not detained." *Id.* at 173, 681 P.2d 980, 67 Haw. 174, 681 P.2d 984 (footnote omitted). In the instant case, however, the dog sniff was conducted in public, with Defendant present, and the vehicle and its contents were detained. The dog in the instant case alerted only after a warrantless intrusion into the truck that the officers themselves could not have accomplished. *See* discussion *infra*.

it was utilized after the purpose of the stop was effectuated:

> Based upon our precedent under the Colorado Constitution, we conclude that *a dog sniff search of a person's automobile in connection with a traffic stop that is prolonged beyond its purpose* to conduct a drug investigation intrudes upon a reasonable expectation of privacy and *constitutes a search and seizure requiring reasonable suspicion of criminal activity.*

*Id.* at 672 (emphases added).

The Kansas Court of Appeals, faced with a similar set of facts, determined that a police dog's entry into a car's passenger compartment constituted an unreasonable search. In *State v. Freel,* 32 P.3d 1219 (Kan.App.2001), a car driven by a man suspected of possessing narcotics was stopped by the police, following a tip from a confidential informant. Upon removing the defendant from the car, an officer walked a narcotics dog around the exterior of the car. The dog jumped into the car and alerted on the floorboard, where the police did not find any drugs.[16] Eventually, drugs were found behind a sun visor. The defendant admitted that the dog's sniff of the exterior was not a search. He contended, however, that the dog's entry into the car was unreasonable. The defendant there argued that the police "facilitated the dog's entry into the car." *Id.* at 1225. The Kansas Court of Appeals, in holding that the contraband should have been suppressed, ex-

plained that the dog's entry into the car constituted an unreasonable search:

> *[P]lacing a dog inside the trunk or passenger compartment of a vehicle is an invasive search requiring probable cause.* Just as an officer could not enter the passenger compartment or trunk of a vehicle to conduct a search without probable cause, neither can a dog be placed inside a vehicle on less than this standard. *United States v. Thomas,* 787 F.Supp. 663, 684 (E.D.Texas 1992).

*Freel,* 32 P.3d at 1225 (emphasis added).

## XI.

### A.

As in the foregoing cases, the use of the narcotics dog here constituted an unreasonable search. Officer Gannon's statement that Ben "entered the vehicle on his own free will" amounts to a contention that the contraband was not discovered because of government intrusion. However, as the court in effect found,[17] it strains credulity to believe, as the majority apparently does, that by happenstance the door of the vehicle was left open at the time the canine "screening" took place. Therefore, it was not clearly erroneous for the court to infer as it did, in light of any contrary explanation from the prosecution in the record, that the door was left open to allow the dog to enter or to sniff the interior of the vehicle, because neither the police nor the dog could properly enter its interior.[18]

---

**16.** The officer maintained that he did not prompt the dog's entry into the car, but a videotape of the search revealed otherwise. *See Freel,* 32 P.3d at 1222.

**17.** In its oral ruling, the court stated, "[I]t's the court's view that [Officer Gannon] knew that the dog would not be permitted in the car, and when you walk by with a loose leash, there is a chance the dog could jump in, and that's exactly what happened.... And I think that it's incumbent upon the State to make sure that these kinds of accidents don't happen[.]" As an appellate court, we defer to the court's assessment of credibility. Plainly, the court had the opportunity to judge credibility and, doing so, exhibited skepticism about Officer Gannon's explanation for the open door. While the court couched its findings in circumspectual language, the express import of its order, suppressing the evidence, manifests the court's disbelief of Officer Gannon's explanation for allowing Ben to leap into the vehicle.

**18.** In its written order, the court found, *inter alia:*

> 3. The scene was completely secured by the time the dog screen was ordered, but the door to the truck was open.
>
> 4. It was apparent from the testimony of [O]fficer Gannon that he was aware that the dog was not permitted to enter the vehicle as that would have amounted to an illegal search.
>
> 5. The only evidence on the record is that the dog alerted after he entered the truck.
>
> 6. *A fair inference is that the dog got into the truck because* it had been transported from place to place by car, and *the police officer did not control the dog jumping in.*
>
> 7. The police closing the door to the truck prior to the dog sniff would have prevented this whole thing from happening.

## B.

There can be no doubt that Ben's entry into the vehicle was illegal. A narcotics dog cannot be considered other than as an extension of the officer. Trained to obey on command, subject to his direction, and brought to the scene by him, it cannot be deemed other than as under the control of the police officer. In the context of search and seizure law, then, a canine cannot have a legal significance independent from that of the police. The dog is an extension of their corporality, acting at their behest. In this context, a dog is used in the discharge of their duties and is not independent or separate from them; in the best of sense a dog is a "friend," and thus, no less, but, like them, to be viewed as akin to a fellow officer. As previously said, there is no excited canine exception to the probable cause and warrant requirements under our constitution.

As in *Freel* and *Haley,* there was an unreasonable search here. At the time of the so-called canine narcotics "screening," there was no probable cause to search the vehicle. Officer Gannon and Ben could not legally enter the vehicle without a warrant. Thus, in entering the vehicle, Ben, who was only an extension of his handler, in fact entered illegally. In the absence of any probable cause, Ben engaged in an exploratory search of a general nature. Under the circumstances,

Ben's alert constituted an unreasonable search. *See Groves,* 65 Haw. at 114, 649 P.2d at 373. Because the use of the canine sniff in the instant case constituted a warrantless search without probable cause, it could not be utilized as a basis for the search warrant. As stated *supra,* the remainder of the search warrant is insufficient to render the subsequent search of the vehicle legal and the fruits of the search were properly suppressed.

## XII.

In light of the foregoing conclusion, it is unnecessary, except as to finding 5, *see supra* note 18, to address the prosecution's contention that certain of the court's findings of fact were erroneous or the prosecution's contention that the court erroneously suppressed Defendant's statements, made after the search.[19]

For the foregoing reasons, I respectfully dissent.

---

8. *There was no reason given that there was any necessity that door [sic] of the vehicle be open.*

(Emphases added.) On appeal, the prosecution challenges only findings 5, 6, and 7. As mentioned *infra,* my analysis of the instant case renders the task of addressing the challenges to the findings unnecessary. I note, however, that there was more than sufficient evidence to support finding 5 and to draw the inference in findings 6 and 7. First, Officer Gannon's affidavit in support of the search warrant plainly stated that the police had used Ben to conduct a "screening" of the truck and that Ben "alert[ed] between the back seat and the center console *within the vehicle*[.]" (Emphasis added.) More-

over, Officer Gannon testified at the hearing on the motion to suppress that he and Ben screened the exterior of the truck when "Ben made entry through [the open truck door] and immediately alerted to the base of the passenger side seat ." He conceded that he was not able to say what would have happened had the door been shut.

19. In light of my belief that the court properly suppressed the fruits of the unlawful search, the charges against Defendant would necessarily be dismissed with prejudice, and, as such, the question of the admissibility of his statements made to police is moot.